THE STATE OF OHIO, APPELLEE, *v.* HUNTER, APPELLANT.

[Cite as *State v. Hunter,* 131 Ohio St.3d 67, 2011-Ohio-6524.]

*Criminal law—Aggravated murder—Death penalty affirmed.*

[No. 2007-2021—Submitted October 18, 2011—Decided December 20, 2011.]

APPEAL from the Court of Common Pleas of Hamilton County, No. B-0600596.

_____

MCGEE BROWN, J.

{¶ 1} This is an appeal of right by defendant-appellant, Lamont Hunter. A three-judge panel convicted Hunter for the aggravated murder and rape of three-year-old Trustin Blue under R.C. 2903.01(C) and 2907.02(A)(1)(b). The panel also convicted Hunter of child endangerment under R.C. 2919.22(B)(1). The panel sentenced Hunter to death based on two death-penalty specifications: R.C. 2929.04(A)(7) (aggravated murder while committing or attempting to commit rape) and 2929.04(A)(9) (aggravated murder of a child under the age of 13).

{¶ 2} For the following reasons, we affirm Hunter's convictions and sentence of death.

**The State's Case**

{¶ 3} In late 2003, Hunter and Luzmilda Blue began a romantic relationship. Hunter then started living with Luzmilda and her three boys, Tyree, Tyrell, and Trustin Blue, born September 12, 2002. Hunter was not the biological father of any of these children. Hunter and Luzmilda later became the parents of a girl, Trinity Hunter.

{¶ 4} After Trustin was born, Luzmilda became sick, and Wilma Forte, a family friend, began taking care of Trustin. Trustin had lived with Forte and her daughter, Amber White, five or six days a week until his death.

**{¶ 5}** On January 30, 2004, Trustin was taken to the emergency room at Cincinnati Children's Hospital because he was unable to bear weight on his left leg. X-rays showed that Trustin had a broken leg. Hunter told medical personnel that he had fallen on some steps while holding Trustin and had landed on him. Doctors accepted Hunter's explanation that Trustin's injuries were accidental.

**{¶ 6}** On June 9, 2004, Luzmilda took Trustin to the emergency room after noticing that his lips and penis were swollen. She also noticed other injuries on Trustin's face and head. Trustin had been left in Hunter's care that day. Luzmilda had not noticed any of these injuries when she left the house earlier that morning.

**{¶ 7}** Dr. Kathy Makoroff, the examining physician, determined that Trustin had a swollen upper and lower lip, an abrasion in one ear and a scratch on his ear canal, hair loss and bruising on one side of his head, and bruising on the tops of both ears. His penis was swollen and had an abrasion at its base.

**{¶ 8}** Dr. Makoroff could not rule out the possibility that a bug had gotten into a loose-fitting diaper and had caused the swelling. But a bug bite would not have caused the bruising on the penis. Moreover, X-rays showed that Trustin had suffered several fractures, in addition to the fracture from January. These included an old and a new fracture on a hand and two fractures on a foot. Dr. Makoroff referred Trustin's case to children services and law-enforcement authorities.

**{¶ 9}** Tiffany Bradbury, an investigator with Hamilton County Job and Family Services, interviewed Hunter about Trustin's injuries. Hunter stated that that he did not see any injuries on Trustin on June 9 and denied hurting him. Hunter said that when he was walking down the stairs with Trustin, he had tripped, and maybe Trustin had been injured.

**{¶ 10}** Criminal charges were not brought against Hunter for Trustin's injuries. But Trustin was removed from his home in June 2004 and was placed

2

with his aunt, Latoya Gresham. Amber White obtained custody of Trustin six months later. In June 2005, Trustin was returned to Luzmilda's custody. But after a week, Luzmilda took Trustin back to White's home.

{¶ 11} Beginning in 2003, White had noticed that Trustin was afraid of Hunter. She stated that Trustin would start crying, shaking, and vomiting when Hunter came around. Forte noticed similar behavior. Forte testified that on one occasion, she was holding Trustin, and he started vomiting when Hunter passed them. On January 17, 2006, two days before he was killed, Trustin told Forte that he was "scared of Lamont. Lamont scared. Lamont hurt Trustin."

{¶ 12} On January 17, 2006, Trustin was staying at White's home. That afternoon, Luzmilda picked up Trustin and took him to her home. Before leaving, Forte gave Trustin a bath and dressed him. Forte did not notice any injuries in Trustin's anal area or elsewhere on his body.

{¶ 13} At 9:00 a.m. on January 19, 2006, Forte spoke to Hunter and Trustin on the telephone for more than 15 minutes. Hunter said that Trustin was fine and was watching a movie. Trustin told Forte that he was watching the movie *Jurassic Park*. Forte stated that Trustin's voice sounded shaky, and he did not seem to be his normal, energetic self.

{¶ 14} Two hours later, Hunter called Luzmilda at work and told her that Trustin had been injured. Luzmilda rushed home. At 11:21 a.m., Luzmilda called 9-1-1 and reported that her son had been hurt after falling down the stairs.

{¶ 15} EMTs arriving at the scene found that Trustin had a low pulse rate and labored breathing and was paralyzed and nonresponsive. Lieutenant Eric Prather, a Cincinnati fireman, asked Hunter how Trustin had been injured. Hunter said that Trustin had fallen down the basement steps. Hunter stated that he thought that Trustin had fallen when Trustin had tried to stop Tiffany from going down the steps.

**{¶ 16}** Dr. Makoroff examined Trustin when he was taken to Children's Hospital. Hunter and Luzmilda told Dr. Makoroff that Trustin had been in his normal state of health that morning. Hunter then explained that he was in the basement doing laundry with his nine-month-old daughter. He heard some rumbling upstairs and saw Trustin tumbling down the basement steps, landing on the concrete floor. Hunter said that Trustin had been unresponsive when he went to help him. Hunter splashed water on Trustin's face. When Trustin did not respond, Hunter called Luzmilda at work.

**{¶ 17}** Dr. Makoroff's examination of Trustin showed that his injuries were not consistent with a fall down the stairs. Trustin suffered a diffuse injury to his brain. He had subdural hemorrhages on both sides of the brain that extended into the middle of the brain. Swelling of his brain was so severe that it had started to herniate into the spinal column. Further examination showed that Trustin had suffered a deep anal tear. The injury was acute and could have been just hours old. Dr. Makoroff testified that the bruising and lacerations were consistent with the insertion of an object into the anal cavity.

**{¶ 18}** During the afternoon of January 19, 2006, Cincinnati police detectives Jane Noel and Jim Wiggington interviewed Hunter about Trustin's injuries. After waiving his *Miranda* rights, Hunter provided a videotaped statement, most of which was played for the panel at trial. In the video, Hunter addresses questions about Trustin's 2004 injuries, as well as the ones that he had suffered that day.

**{¶ 19}** Hunter told police that Luzmilda had left for work at 6:00 that morning. Trustin, Terrell, and Tyree woke up at 8:00 a.m. Terrell and Tyree, ages 8 and 11, left for school at 8:45 a.m. Hunter said that Trustin had been acting fine when he awoke. Trustin ate some breakfast and started watching *Jurassic Park*.

4

{¶ 20} Hunter left Trustin in the living room, and he went with Trinity to the basement to do laundry. Shortly thereafter, Hunter heard Trustin running upstairs. Hunter thought that Trustin was excited about the dinosaurs in the movie and was rushing to tell him about them. Hunter then heard Trustin tumbling down the basement stairs. Hunter said that he heard every step that Trustin hit as he fell down the stairs. Hunter turned around and saw Trustin at the bottom of the steps. Trustin was folded over, and his leg was on the bottom step.

{¶ 21} Hunter said that Trustin was limp and unresponsive. He took Trustin upstairs and splashed water on his face. He also attempted to revive Trustin. Hunter then called Luzmilda and told her what happened. She immediately came home and called 911.

{¶ 22} As the interview progressed, Detective Wiggington told Hunter that the attending physician did not think that Trustin's injuries were consistent with a fall down the steps. Hunter replied that he did not have "an answer to that." Hunter stated that what happened was simply an accident. Hunter said that the only thing he could have done differently was to remain upstairs or shut the basement door when he did the laundry.

{¶ 23} Hunter told investigators that nothing else happened to Trustin before the fall. He stated that Trustin had been fine the previous evening and that Trustin had slept with his mother. Hunter said that he would never hurt a child. He also stated that he did not injure Trustin by shaking him. However, investigators did not ask Hunter about the anal tear during the interview, and nothing was mentioned about it.

{¶ 24} On January 20, 2006, Barbara Mirlenbrink, a criminalist with the Cincinnati police department, went to Trustin's home to collect evidence. She found no evidence of blood or anything of evidentiary value on the basement stairs or elsewhere in the house. Mirlenbrink stated that there were 11 carpeted steps leading from the kitchen to the basement floor. The distance from the top of

the stairs to the bottom of the steps was 11 feet, two inches. She also examined the washer and dryer in the basement. She found that the washer was empty, and clothing was on top of the dryer.

{¶ 25} On January 27, 2006, Mirlenbrink returned to Trustin's home and looked for sharp objects that might have been inserted into Trustin's anus. Mirlenbrink collected two Tiki torches and a tire gauge. Subsequent forensic testing of these items disclosed nothing of evidentiary value. But Mirlenbrink stated that blood was found on the underwear that Trustin had been wearing.

{¶ 26} On January 21, 2006, CT scans showed that Trustin was brain dead. On January 22, 2006, Dr. Mona Stephens, the Hamilton County deputy coroner, conducted the autopsy on Trustin. Her examination found two separate areas of broad impact on Trustin's head. The brain itself was very swollen and had a subarachnoid hemorrhage. Trustin also suffered a serious neck injury. Dr. Stephen stated that the cartilage had been pulled loose from the thoracic vertebra.

{¶ 27} Dr. Stephens stated that the two distinct impact sites show that something had struck Trustin in the head or his body had been slammed against something. She stated, "[I]f he were struck in the head, it would have to be a blow such that the neck would then travel in a sharp fashion and * * * [would require] a major amount of force." Alternatively, Dr. Stephens said that "if he were picked up and held by the torso or below and hit against something, that would be an easier injury to produce * * * because there is more movement associated with that to pop that disk loose from the spine bone."

{¶ 28} Dr. Stephens found a 1.9 centimeter laceration of Trustin's anus. There was a hemorrhage along the rectum's lining and a hemorrhage going into both sides of the pelvis. There were also three areas of perforation of the rectal mucosa. Dr. Stephens stated that these perforations "would be similar to what you could produce with something like a pencil, jammed with a pencil or

something sharp like that, or could even be from an angled insertion of something."

**{¶ 29}** Dr. Stephens concluded, "[D]iffuse brain injury due to blunt impact/shaking injuries to the head [is] the cause of death. The manner of death is homicide." She stated that Trustin's injuries were not consistent with a fall down the steps. Dr. Stephens also testified, "The only way I can conceive of this being partially caused by a fall down 11 carpeted steps is if he had fallen off the side of the stairs and landed on his head twice, and that still wouldn't have explained the anal injuries."

### The Defense Case

**{¶ 30}** The defense presented no trial-phase witnesses. However, the defense introduced two exhibits. Defense exhibit No. 1 is the physician's report, signed by Dr. Makoroff, that documented Trustin's hospital care on January 19, 2006. Trial counsel used this report during his cross-examination of Dr. Makoroff.

**{¶ 31}** Defense exhibit No. 2 is a medical study completed by M.G.F. Gilliland, entitled Interval Duration Between Injury and Severe Symptoms in Nonaccidental Head Trauma in Infants and Young Children. Trial counsel referred to this study during his cross-examination of Dr. Stephens.

### Case History

**{¶ 32}** On the day of the autopsy, Hunter was arrested. A week later, he was indicted on three counts. In Count One, Hunter was charged with the aggravated murder of Trustin, a child under the age of 13. This count contained two death-penalty specifications. Specification One charged Hunter with aggravated murder while committing or attempting to commit rape, R.C. 2929.04(A)(7). Specification Two charged Hunter with the aggravated murder of a child under the age of 13, R.C. 2929.04(A)(9).

{¶ 33} In Count Two, Hunter was charged with raping Trustin, and Count Three charged Hunter with child endangerment.

{¶ 34} Hunter pleaded not guilty to all charges. However, a three-judge panel found Hunter guilty of all charges and sentenced him to death. Hunter was also sentenced to life in prison without parole for rape and eight years' imprisonment for child endangerment. The sentences on all counts were ordered to run consecutively.

### Issues on Appeal

{¶ 35} *Ineffective assistance of counsel.* In proposition of law I, Hunter argues that his counsel provided ineffective assistance of counsel during both phases of the trial.

{¶ 36} Reversal of a conviction for ineffective assistance requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus.

{¶ 37} As an initial matter, Hunter argues that trial counsel's performance must be judged by the standards set forth in the American Bar Association ("ABA") Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (Rev.Ed.2003). The stated objective of the guidelines is to "set forth a national standard of practice for the defense of capital cases in order to ensure high quality legal representation for all persons facing the possible imposition or execution of a death sentence by any jurisdiction." Guideline 1.1(A). To this end, the ABA guidelines present a detailed prescription for the legal representation of capital defendants.

{¶ 38} Despite this claim, Hunter has failed to specify the provisions of the ABA guidelines that trial counsel violated in representing him.

{¶ 39} Moreover, the Supreme Court has held that the ABA guidelines are "only guides" to what reasonableness means, not its definition. *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052, 80 L.Ed.2d 674. In *Bobby v. Van Hook* (2009), __U.S.__, 130 S.Ct. 13, 175 L.Ed.2d 255, the Supreme Court reversed a Sixth Circuit Court of Appeals opinion that relied on the ABA guidelines to grant a capital defendant relief on the grounds that his lawyers had performed deficiently in investigating and presenting mitigating evidence. The Supreme Court criticized the Sixth Circuit for treating the guidelines " not merely as evidence of what reasonably diligent attorneys would do, but as inexorable commands with which all capital defense counsel 'must fully comply.' " Id. at ___, 130 S.Ct. at 17, 175 L.Ed.2d 255, quoting *Van Hook v. Anderson* (C.A.6, 2009), 560 F.3d 523, 526. The Supreme Court continued, " '[W]hile States are free to impose whatever specific rules they see fit to ensure that criminal defendants are well represented, we have held that the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices.' " Id., quoting *Roe v. Flores-Ortega* (2000), 528 U.S. 470, 479, 120 S.Ct. 1029, 145 L.Ed.2d 985.

{¶ 40} Accordingly, trial counsel's performance is reviewed under the two-pronged *Strickland* analysis. We now address Hunter's assertions of ineffective assistance of counsel.

{¶ 41} **1. Pending charges against trial counsel**. Hunter argues that he was denied effective assistance of counsel because Clyde Bennett II, his retained counsel, was facing criminal charges in federal court while he represented Hunter.

{¶ 42} On February 5, 2007, just prior to the beginning of trial, Hunter retained Bennett, an attorney with Dinsmore & Shohl in Cincinnati, as his new counsel, and his appointed counsel were dismissed. Bennett represented Hunter during both phases of the trial.

{¶ 43} Approximately two months after Hunter was sentenced to death, Bennett was convicted in federal court for the offense of unlawfully structuring

financial transactions. Subsequently, Bennett was sentenced to 24 months in prison and a $4,000 fine.

{¶ 44} Nothing about Bennett's pending charges was mentioned by any of the parties during Hunter's trial. Hunter also does not mention when he learned that Bennett was facing charges in federal court. Nonetheless, Hunter asserts, "[W]e now know that * * * Bennett was desperate for cash, and not inclined to tell defendant-appellant's family that he was distracted by his own issues, and unable to go forward effectively."

{¶ 45} Hunter argues that Bennett failed to get involved in his case from the onset of law enforcement's focus on Hunter. Hunter argues that this failure occurred because counsel was distracted by the charges pending against him. However, this ineffectiveness claim lacks merit because Bennett was not retained to represent Hunter until shortly before his scheduled trial date. Thus, Bennett could not have become involved in assisting Hunter earlier. In any event, Bennett's legal problems relating to pending charges do not establish ineffective assistance of counsel. See *State v. Smith* (Minn.1991), 476 N.W.2d 511, 516; *State v. Williams* (1989), 52 Ohio App.3d 19, 556 N.E.2d 221, paragraph two of the syllabus ("[p]ending criminal charges against an attorney are, without more, insufficient to support a claim of ineffective assistance of counsel* * *").

{¶ 46} Likewise, Hunter's assertions that counsel's representation was tainted because Bennett was "desperate for cash" and was "not inclined" to disclose that he was distracted by his own issues are speculative. Nothing in the record before us speaks to federal investigations of Bennett or to their alleged effect on Bennett's representation of Hunter. "A reviewing court cannot add matter to the record before it, which was not a part of the trial court's proceedings, and then decide the appeal on the basis of the new matter." *State v. Ishmail* (1978), 54 Ohio St.2d 402, 8 O.O.3d 405, 377 N.E.2d 500, paragraph one of the syllabus (reversing the judgment of a court of appeals that had considered,

in an appeal from a postconviction proceeding, a transcript that had not been before the trial court in the proceeding that was appealed). Thus, Hunter's claims about his counsel's motivation and actions provide no support for his present claims.

{¶ 47} In sum, Hunter's ineffectiveness claim fails to satisfy the two-pronged *Strickland* analysis. Hunter has failed to demonstrate that counsel provided deficient performance because he was facing unrelated criminal charges in federal court. Hunter has also failed to demonstrate that the result of his trial would have been different if trial counsel had not been facing these charges.

{¶ 48} **2. Jury waiver**. Hunter claims that his counsel was ineffective because he advised Hunter to waive a jury trial without sharing with him "statistical data" discrediting the wisdom of this decision. Hunter states that if his case had been tried before a jury, he would have had a fighting chance during both phases of the trial.

{¶ 49} A jury waiver must be voluntary, knowing, and intelligent. Crim.R. 23; *State v. Fitzpatrick*, 102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d 927, ¶ 37. If the record shows a jury waiver, the conviction will not be set aside except on a plain showing that the defendant's waiver was not freely and intelligently made. Id. Moreover, a written waiver is presumptively voluntary, knowing, and intelligent. Id.

{¶ 50} Nothing in the record suggests that Hunter's jury waiver was involuntary. Hunter submitted a signed jury waiver. Before the trial court accepted his jury waiver, Hunter assured the court that his waiver was voluntarily made. Trial counsel also informed the court, "[T]he issue of waiving the jury in this case has been discussed at length with defense counsel and Mr. Hunter, my client. This is not the first day or the first time that this issue has been brought to his attention. We have discussed this in detail for a week, so this is not a fly-by-

11

night decision, and it's well thought out and something we thought about as a defendant and counsel."

{¶ 51} Nonetheless, Hunter argues that his waiver was not voluntary, because, he says, virtually all experts agree that counsel's advice to waive a jury in a capital case is presumptively malpractice. Hunter contends that his waiver forfeited the advantage of a jury trial: that a single juror can block a death recommendation.

{¶ 52} Hunter cites no authority in support of his claims that he bore an increased risk of being sentenced to death by a three-judge panel. Moreover, any one of the three judges alone could have prevented the imposition of the death penalty. See R.C. 2929.03(D)(3).

{¶ 53} Additionally, trial counsel provided a reasonable explanation for proceeding with a three-judge panel rather than a jury. During final argument, trial counsel argued:

{¶ 54} "[T]his case was not tried to a jury because lay people in general don't have the capacity to allow the law to transcend emotion, passion, rhetoric, provocation from horrific, egregious, heinous crime that actually was committed. But I believe that as jurists, officers of the court, has the ability to apply the law to the facts of this case, notwithstanding the horrific, heinous injury and death to a child. And I submit, based on the evidence adduced at the trial of this matter, if you do that, he should be acquitted of aggravated murder and rape charges."

{¶ 55} The fact that Hunter voluntarily waived his right to a jury does not establish ineffective assistance of counsel. Neither does trial counsel's encouragement that Hunter seek a three-judge panel. Under the circumstances, this appears to have been a reasonable tactical decision. Indeed, trial counsel may have concluded that Hunter should proceed with a three-judge panel instead of a jury because of the horrific nature of the charges involving the death of a three-

year-old child. Thus, Hunter has failed to establish that his counsel was ineffective.

{¶ 56} **3. Requesting a continuance**. Hunter argues that his counsel was ineffective because counsel requested a continuance to prepare for the penalty-phase proceedings.

{¶ 57} On June 15, 2007, after the panel returned its verdict, Hunter's trial counsel requested a continuance until July 19, 2007, to conduct the mitigation hearing. That request was granted.

{¶ 58} On July 3, 2007, trial counsel submitted a request for additional time to prepare for mitigation. Trial counsel noted that "the previously hired mitigation specialist is no longer available and no longer works in this field. The Defendant is currently conducting mitigation work on his own behalf." On July 19, 2007, the panel granted a continuance until September 5, 2007.

{¶ 59} Hunter fails to explain how counsel was ineffective because he requested a continuance to prepare for mitigation. Hunter retained Bennett to represent him just before his trial was to begin. Hunter should have known that trial counsel would need additional time to prepare for the penalty-phase proceedings should he be found guilty of the capital specifications. Indeed, counsel would have provided ineffective assistance if he knew that he was unprepared and failed to request a continuance. Hunter has also failed to explain how he was prejudiced by counsel's request. Accordingly, this ineffectiveness claim also lacks merit.

{¶ 60} **4. Failure to utilize a second counsel, a defense investigator, and expert witnesses**. Hunter argues that his retained counsel violated the principle of "team defense." First, he argues that trial counsel was ineffective by failing to proceed to trial without the assistance of a second lawyer.

{¶ 61} Sup.R. 20(II)(A), titled "Appointment of counsel for indigent defendants in capital cases," provides that "at least" two attorneys (with death-

penalty qualifications and experience) shall be appointed by the court to represent an indigent defendant charged with capital murder.[1]  However, Sup.R. 20(I)(B) states that these rules apply "only in cases where the defendant is indigent and counsel is not privately retained by or for the defendant."  Sup.R. 20(I)(C) also provides: "If the defendant engages one privately retained attorney, the court shall not appoint a second attorney pursuant to this rule."

{¶ 62} Hunter chose to retain private counsel.  When that decision was made, Hunter told the court that he was satisfied that Bennett was now his counsel.  Hunter also acknowledged that his two appointed counsel would no longer represent him after he retained Bennett.

{¶ 63} Hunter has the burden of demonstrating that his counsel rendered ineffective assistance.  *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 62.  Hunter has failed to meet this burden.  His generalized claim fails to specify how Bennett's trial performance was deficient because of his failure to use the assistance of second counsel.  Hunter also fails to explain how he was prejudiced by such absence.  Accordingly, we reject this claim.

{¶ 64} Second, Hunter argues that counsel was ineffective by failing to proceed with an independent defense investigator during both phases of trial.  The record shows that appointed counsel hired Martha Phillips, a mitigation specialist, and Dr. Cyma Khalily, a psychiatrist, to consider Hunter's circumstances, and Robert Cantou, M.D., to review Trustin's medical records.  The court authorized their fees.  Retained counsel also requested a mitigation expert.  Subsequently, retained counsel obtained two continuances to prepare for mitigation.  During the first requested continuance, retained counsel mentioned that on July 19 (the date of the scheduled mitigation hearing), "there will be a mitigation [sic] Martha

---

1.  These are the Rules of Superintendence currently in effect.  The Rules of Superintendence in effect in 2007 have been renumbered but were not changed substantively.

Phillips." In requesting the later continuance, counsel noted that the mitigation specialist "is no longer available and no longer works in this field. The Defendant is currently conducting mitigation work on his own behalf."

{¶ 65} Hunter cites nothing in the record to show that retained counsel conducted an inadequate investigation. The record does not show the extent of counsel's investigation or whether he relied on work completed by the experts hired by appointed counsel. We "cannot infer a defense failure to investigate from a silent record." *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 244. Moreover, trial counsel called many family members and others during the penalty phase who provided detailed information about Hunter's background and family life. Thus, the record fails to support this ineffectiveness claim.

{¶ 66} Finally, Hunter argues that his counsel was ineffective by relying exclusively on his cross-examination skills to undermine the testimony of the state's expert witnesses. "As an initial matter, the failure to call an expert and instead rely on cross-examination does not constitute ineffective assistance of counsel." *State v. Nicholas* (1993), 66 Ohio St.3d 431, 436, 613 N.E.2d 225, citing *State v. Thompson* (1987), 33 Ohio St.3d 1, 10-11, 514 N.E.2d 407. Hunter's argument that defense experts were necessary to impeach the testimony of the state's experts is purely speculative. Hunter fails to identify the expert witnesses who should have been called or what they would have said. Thus, trial counsel's decision to rely on cross-examination appears to have been a legitimate "tactical decision." See *State v. Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, ¶ 97. We also reject this claim.

{¶ 67} **5. Failure to call a psychologist or psychiatrist**. Hunter argues that his counsel was ineffective by failing to employ a psychologist or psychiatrist. Hunter asserts that at a minimum, counsel should have had him evaluated to determine his potential for future dangerousness if given a life

sentence. Hunter contends that studies indicate that it is highly unlikely that a rapist and killer of a young child would ever show aggression against other inmates or guards.

{¶ 68} As previously discussed, appointed counsel obtained the services of a psychiatrist. The record does not indicate the extent of the psychiatrist's evaluation of the defendant or retained counsel's use of such assistance. Again, we cannot infer counsel's failure to investigate from a silent record; the burden of demonstrating ineffective assistance is on Hunter. See *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 244. Thus, Hunter has failed to demonstrate that counsel was deficient. Moreover, Hunter has failed to show that counsel was deficient by failing to present testimony that he lacked the potential for future dangerousness. There is no evidence to suggest that the psychiatrist would have reached that conclusion. See *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 118.

{¶ 69} **6. Failure to present an affirmative defense during the penalty phase and other instances of deficient performance**. First, Hunter argues that trial counsel provided deficient representation by failing to develop an affirmative defense for sparing his life. This claim lacks merit.

{¶ 70} Trial counsel presented extensive mitigating evidence during the penalty phase. Five family members and two others testified about Hunter's background and family life. Leevell Hunter, the defendant's father, indicated that Hunter had had an alcohol-abuse problem and had been involved with drugs. The witnesses also expressed their hope that Hunter would receive a life sentence and explained that a death sentence would have a horrible impact on the family. In addition, Hunter presented a detailed, unsworn statement. Finally, trial counsel's final argument raised residual doubt as an issue and set forth all the mitigating factors favoring a life sentence.

**{¶ 71}** As previously discussed, nothing in the record shows that trial counsel did not conduct an adequate investigation. Appointed counsel obtained a mitigation specialist and a psychiatrist to evaluate Hunter and a doctor to review Trustin's medical records. Retained counsel also obtained two continuances to prepare for the penalty phase. Beyond that, the record does not show the extent of counsel's investigation. Thus, based on the record before this court, Hunter has failed to demonstrate that trial counsel performed inadequately in preparing for mitigation.

**{¶ 72}** Hunter cites *Dickerson v. Bagley* (C.A.6, 2006), 453 F.3d 690, and *Poindexter v. Mitchell* (C.A.6, 2006), 454 F.3d 564, in arguing that his counsel's performance was inadequate. *Dickerson* held that counsel provided ineffective assistance by failing to conduct a complete and thorough mitigation investigation. Id. at 699. The court determined that counsel did not learn or prove facts about the defendant's family, educational, social, or medical history or discover that the defendant had an IQ of 77, making him borderline mentally retarded. Id. at 691-692 and 695. The court found that it was much more likely that the sentencer would have seriously contemplated a life sentence based on reduced culpability if it had been presented this evidence. Id. at 699.

**{¶ 73}** Unlike in *Dickerson*, nothing in the record shows that trial counsel completed an inadequate investigation into Hunter's background and mental state in preparing for his mitigation hearing. Thus, Hunter's reliance on *Dickerson* is misplaced.

**{¶ 74}** *Poindexter* is also inapposite. *Poindexter* held that trial counsel was ineffective by failing to conduct "virtually any investigation." *Poindexter*, 454 F.3d at 578. The court found that counsel had failed to request funds to hire a psychological or psychiatric expert to evaluate the defendant even though he exhibited odd behavior. Id. at 579. Counsel had also failed to interview key family members and friends who could have described the defendant's

upbringing. Id. The court also noted that defense counsel did not begin to prepare for mitigation until five days before the penalty phase began. Id. *Poindexter* held that counsel's failures were prejudicial because the jury was not presented with a full picture of the defendant's troubled childhood and could not therefore accurately assess his moral culpability. Id.

{¶ 75} Again, Hunter has presented nothing to show that his counsel failed to conduct an adequate mitigation investigation. Indeed, the record shows that a psychiatrist was employed, and seven witnesses testified on Hunter's behalf.

{¶ 76} Second, Hunter argues that trial counsel provided deficient performance by failing to object to "other acts" evidence, even though appointed counsel had filed a pretrial motion to exclude such evidence under Evid.R. 404(B). Initially, Hunter complains about counsel's failure to object to evidence about his convictions for selling drugs.

{¶ 77} At the penalty phase, trial counsel asked Leevell Hunter the following question:

{¶ 78} "Q: Okay. What involvement, if any, did Lamont have with drugs, if you know?

{¶ 79} "A: I kind of had an idea that he was using, but I didn't never confront him * * *."

{¶ 80} During cross-examination, the prosecutor asked Leevell about Hunter's criminal record for selling drugs:

{¶ 81} "Q: You said at some point that you had had an idea that your son was using drugs?

{¶ 82} "A: Yes.

{¶ 83} "Q: And in fact he went to the penitentiary two different times for drugs; isn't that correct?

{¶ 84} "A: Yes. Not for use, for selling.

{¶ 85} "Q: For selling?

**{¶ 86}** "A:  Yeah.

**{¶ 87}** "Q:  So at some point you had more than an idea that he was involved with drugs because he was convicted of two different felonies and went to prison two different times?

**{¶ 88}** "A:  Yes, for not using for himself, for selling."

**{¶ 89}** Trial counsel elicited testimony from Leevell that opened the door to cross-examination about Leevell's knowledge of Hunter's drug convictions. Trial counsel was not ineffective for failing to object to this line of cross-examination, because the defense may have lacked a basis for objecting.

**{¶ 90}** Moreover, trial counsel may have made a tactical decision not to object to such questioning.  See *State v. Keith* (1997), 79 Ohio St.3d 514, 530, 684 N.E.2d 47.  Trial counsel used testimony about Hunter's drug involvement as a mitigating factor for the panel's consideration.  During final argument, trial counsel argued that Hunter's involvement with "alcohol and drugs * * * is a mitigating factor and * * * sort of explains * * * his conduct for which he was convicted" and supports the imposition of a life sentence.  Thus, trial counsel may have reasonably decided not to object to testimony about Hunter's drug convictions because it highlighted the seriousness of his drug involvement.  See *State v. Gowdy* (2000), 88 Ohio St.3d 387, 396-397, 727 N.E.2d 579.

**{¶ 91}** Even if trial counsel's questioning reflected deficient performance, Hunter has failed to establish prejudice under the *Strickland* test.  Testimony about the two drug convictions was of minor significance, given the compelling evidence of the aggravated murder and rape charges that Hunter was found guilty of committing.  Moreover, it is presumed that the three-judge panel "considered only the relevant, material, and competent evidence in arriving at its judgment." *State v. White* (1968), 15 Ohio St.2d 146, 151, 44 O.O.2d 132, 239 N.E.2d 65.

**{¶ 92}** Hunter also complains that his counsel opened the door to testimony about domestic violence.  During direct examination, Tamara Kay

Mitchell, Hunter's ex-wife, testified that Hunter is not an abusive person and was never abusive towards children. But Mitchell acknowledged that she had had a domestic-violence case with Hunter 15 years ago. She explained, "I mean, we were young. Things happen. He's not an abusive person though."

{¶ 93} On cross-examination, the prosecutor asked Mitchell further questions about Hunter's domestic violence. She stated, "[W]e had three incidents where things happened and they got out of control and, yes, the police were called. As far as him being violent, no."

{¶ 94} Trial counsel was not ineffective by eliciting testimony about Hunter's history of domestic violence with Mitchell. Mitchell's testimony that Hunter did not abuse children was important mitigating evidence. Counsel could legitimately decide to present such testimony, even though derogatory information about Hunter was also disclosed as a result. See *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶ 117.

{¶ 95} Third, Hunter argues that trial counsel was ineffective by failing to object to unrecorded sidebar discussions  Appointed and retained counsel requested that all sidebars be recorded, and the motion was granted "as to substantive issues." Nonetheless, counsel failed to object to two sidebar conferences held off the record. The trial court afterwards stated on the record that both sidebars addressed only scheduling issues. Thus, Hunter cannot demonstrate that counsel's failure to object was prejudicial, since the unrecorded proceedings did not deal with substantial and important legal matters. See *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 136.

{¶ 96} Finally, Hunter argues that trial counsel was ineffective by failing to force Dr. Stephens, the deputy coroner, and Dr. Makoroff, a pediatrician, to set forth their credentials. Yet the record shows that both of these witnesses discussed their credentials before testifying. Dr. Stephens set forth her educational background and work experience and described her duties as a

pathologist. Similarly, Dr. Makoroff discussed her educational background, mentioned her work experience, and described her duties.

{¶ 97} **7. Failure to seek a negotiated plea for a lesser sentence.** Hunter argues that his counsel had an affirmative duty to seek a negotiated plea for a sentence other than death. But the record does not reflect whether trial counsel attempted to negotiate such an agreement. Accordingly, Hunter has not met his burden of demonstrating that counsel rendered ineffective assistance.

{¶ 98} Based on the foregoing, we overrule proposition I.

{¶ 99} *Lack of capitally certified counsel*. In proposition of law II, Hunter argues that he was denied effective assistance of counsel because his counsel was not certified under Sup.R. 20.

{¶ 100} Sup.R. 20 requires that counsel appointed to represent indigent defendants in capital cases have certain qualifications. Hunter argues that trial counsel was ineffective because there is no indication that he was certified under this rule. But Hunter chose to retain private counsel, and Sup.R. 20 certification does not apply and was not required. Sup.R.20(I)(B). In *State v. Keith*, 79 Ohio St.3d at 534, 684 N.E.2d 47, this court held that it would not "impose a rule that creates a presumption of ineffective assistance of counsel where counsel has been retained by or for a defendant and is not qualified under C.P.Sup.R. 65."[2] See also *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 142. Accordingly we overrule proposition II.

{¶ 101} *Failure to call a mitigation expert*. In proposition of law III, Hunter argues that his counsel was ineffective by failing to call the defense mitigation expert as a penalty-phase witness.

{¶ 102} Hunter's appointed counsel hired Martha Phillips as the defense mitigation specialist. At the completion of the guilt-phase proceedings, Hunter's retained counsel obtained a continuance until July 19, 2007, to prepare for the

---

2. Sup.R. 20 was formerly C.P.Sup.R. 65.

penalty-phase proceedings. Trial counsel stated, "On the 19th there will be a mitigation [sic] Martha Phillips."

**{¶ 103}** On July 3, 2007, trial counsel requested an additional continuance for more preparation time. Counsel stated, "[T]he Defendant's previously hired mitigation specialist is no longer available and no longer works in this field. The Defendant is currently conducting mitigation work on his own behalf." A continuance was granted until September 5, 2007. On that date, the penalty-phase proceedings were conducted, and seven witnesses testified on behalf of the defendant.

**{¶ 104}** An attorney who fails to conduct a reasonable investigation into a defendant's history and background provides ineffective assistance. *State v. Dixon,* 101 Ohio St.3d 328, 2004-Ohio-1585, 805 N.E.2d 1042, ¶ 60, citing *Wiggins v. Smith* (2003), 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471. However, Hunter has the burden of demonstrating that his counsel rendered ineffective assistance. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 62.

**{¶ 105}** It appears that Martha Phillips was not called as a defense witness, because she discontinued working as the mitigation specialist. Nothing shows what testimony Phillips would have provided if she had been called as a witness. Thus, Hunter has failed to demonstrate that trial counsel was deficient by not calling her as a witness. See *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 350.

**{¶ 106}** Trial counsel was fully capable of conducting a satisfactory investigation into Hunter's history and background after Phillips became unavailable. Hunter cites nothing in the record to show that his counsel conducted a less than adequate investigation. Moreover, trial counsel would have had access to mitigating evidence that the defense collected before he was retained.

{¶ 107} Based on the foregoing, proposition III is rejected.

{¶ 108} *Other-acts evidence*.  In proposition of law IV, Hunter argues that the admission of evidence that he had previously abused Trustin was improper "other acts" evidence.

{¶ 109} Over defense objection, Dr. Makoroff testified that on January 30, 2004, she treated Trustin in the emergency room for a broken tibia.  Hunter informed medical personnel that the injury had occurred when he was holding Trustin and fell on the steps.  Hunter provided a similar explanation in his taped statement on January 19, 2006.  Additionally, Wilma Forte testified that Hunter had told her that Trustin was injured when Hunter "was carrying [Trustin] up the steps, and he stepped on a toy and fell with Trustin."

{¶ 110} Over objection, Dr. Makoroff also testified that on June 9, 2004, she had treated Trustin in the emergency room for swollen lips, a scratch in his ear canal, bruising on both sides of his ears, a swollen penis, and an abrasion at the base of his penis.  X-rays also showed that Trustin had multiple fractures on a hand and a foot.  Dr. Makoroff stated, "[M]y impression was that this was a case of definite child abuse."

{¶ 111} Over objection, Tiffany Bradbury testified that on June 9, 2004, she interviewed Hunter about Trustin's injuries.  Hunter denied that he had hurt Trustin.  Hunter said that he had been caring for Trustin after Luzmilda left home that morning.  Hunter stated that he had tripped while he was walking downstairs with Trustin, and "maybe" Trustin had been injured then.

{¶ 112} Defense counsel argued that evidence about the January and June 2004 incidents was inadmissible, because it was irrelevant and prejudicial.  But the panel overruled the defense objections and admitted the evidence under Evid.R. 404(B).  It did, however, exclude evidence of Hunter's criminal record.

{¶ 113} Under Evid.R. 404(B), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove" a defendant's criminal propensity.  "It may,

however, be admissible * * * [to show] motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage* (1987), 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343, paragraph two of the syllabus.

{¶ 114} The panel did not abuse its discretion in admitting evidence of the January and June 2004 incidents. The January and June 2004 incidents were relevant in rebutting Hunter's claim that Trustin died in an accidental fall. See *State v. Burson* (1974), 38 Ohio St.2d 157, 159, 67 O.O.2d 174, 311 N.E.2d 526. The earlier incidents were eerily similar to the episode underlying the charged offense. Hunter claimed that Trustin had been injured in an accidental fall on the two occasions that he had been brought to the emergency room in 2004. Such evidence was particularly relevant because it showed that Hunter's claim that Trustin died during an accidental fall was probably untrue. Based on this evidence, the panel could reasonably infer that Hunter acted purposefully in killing Trustin. See *State v. Banks* (1992), 78 Ohio App.3d 206, 212, 604 N.E.2d 219; *State v. Patton* (Jan. 21, 1992), 12th Dist. No. CA91-06-102, 1992 WL 9534, *5; see also Imwinkelried, Uncharged Misconduct Evidence, Vol. I (Rev.Ed.2001) 16-22, Section 5:06.

{¶ 115} Finally, the fact that the 2004 acts differ in some detail from the charged offenses does not affect the admissibility of the other-acts evidence. Such differences go to weight, not admissibility. See *State v. Jamison* (1990), 49 Ohio St.3d 182, 187, 552 N.E.2d 180.

{¶ 116} Based on the foregoing, proposition IV is overruled.

{¶ 117} *Sufficiency and manifest weight of the evidence*. In proposition of law VIII, Hunter argues that there was insufficient evidence to convict him of the counts and specifications. In proposition of law IX, Hunter argues that the verdict is against the manifest weight of the evidence.

**{¶ 118}** A claim of insufficient evidence invokes a due process concern and raises the question whether the evidence is legally sufficient to support the verdict as a matter of law. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541. In reviewing such a challenge, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d, 212, paragraph one of the syllabus.

**{¶ 119}** A claim that a verdict is against the manifest weight of the evidence involves a different test. " 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins*, at 387, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717.

**{¶ 120}** Hunter's sufficiency claims lack merit. Wilma Forte's and Amber White's testimony, Hunter's statements to investigators and other individuals, medical testimony, and the autopsy results were sufficient to establish Hunter's guilt. The evidence shows that on the morning of January 19, 2006, Trustin died from severe head injuries while he was under Hunter's care and supervision. His girlfriend, Luzmilda, had left earlier that morning to go to work. Later that morning, Forte had talked to Trustin on the phone, and he had said that he was

fine and was watching a movie. Two hours later, Hunter called Luzmilda and told her that Trustin had been injured.

{¶ 121} EMTs arriving at the home found that Trustin was paralyzed and unresponsive and rushed him to the hospital. Hunter told medical personnel and investigators that Trustin was injured when he accidentally fell down the basement stairs. Yet Dr. Makoroff testified that Trustin had suffered severe brain injuries that were inconsistent with a fall down 11 carpeted stairs. Examination also showed that Trustin had a deep anal tear that could have been just hours old.

{¶ 122} Following Trustin's death, Dr. Stephens conducted the autopsy and determined that his cause of death was a "diffuse brain injury due to blunt impact/shaking injuries to the head." Trustin suffered two separate areas of broad impact on the head. Dr. Stephens testified that the two impact sites show that either something struck Trustin in the head or his body had been struck against something. Dr. Stephens also found a 1.9-centimeter laceration of the anus and three areas of perforation of the rectal mucosa. Dr. Stephens stated that the perforations were caused by the insertion of a sharp object into the rectal area.

{¶ 123} Evidence was also introduced showing that Trustin had previously been hurt while under Hunter's care and supervision. In January 2004, Trustin had been taken to the emergency room with a broken tibia. Hunter claimed that these injuries were caused when he was holding Trustin and fell on the stairs. In June 2004, Trustin was taken to the emergency room again. An examination showed that Trustin had multiple fractures of a hand and a foot, a swollen and bruised penis, and other injuries. Hunter told an investigator that these injuries might have been caused by a fall down the steps.

{¶ 124} White testified that beginning in 2003, she noticed that Trustin acted fearful when Hunter was around him. Forte noticed similar behavior. Forte also testified that on January 17, 2006, Trustin told her that he was "scared of Lamont. Lamont scared. Lamont hurt Trustin."

{¶ 125} Hunter claims that there is little evidence to show that he purposefully caused Trustin's death with prior calculation and design. However, the three-judge panel found Hunter guilty as the principal offender in the commission of aggravated murder. He was not found guilty on the theory that he had been an aider or abettor who had committed the murder with prior calculation and design.

{¶ 126} Finally, Hunter claims that he was found guilty because he was the only adult present and that there are other plausible explanations for Trustin's death. Hunter repeatedly told medical personnel and investigators that Trustin had been injured when he accidentally fell down the stairs. But Dr. Makoroff's testimony and the autopsy results refute this claim.

{¶ 127} Moreover, there is no plausible explanation for Trustin's anal tear except that Hunter caused these injuries near the time of Trustin's death. Dr. Makoroff's examination of Trustin showed that he had "acute bleedings meaning some fresh blood" in his anal area. Dr. Makoroff testified that it "certainly could have just been hours old because it just kept bleeding as we manipulated it." Dr. Makoroff also testified that the anal tear would have been painful. Yet Forte had talked to Trustin shortly before his death, and Trustin did not complain about being hurt. Blood was also found on the underwear that Trustin was wearing on the morning that he was killed.

{¶ 128} Despite some discrepancies, the panel accepted the testimony of the state's witnesses. Furthermore, a review of the entire record shows that the testimony was neither inherently unreliable nor unbelievable. We find that witness testimony, circumstantial evidence, and medical evidence provided sufficient evidence to prove beyond a reasonable doubt that Hunter is guilty of all counts and specifications.

{¶ 129} With respect to Hunter's manifest-weight challenges, this is not an " 'exceptional case in which the evidence weighs heavily against the

conviction.' " *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *Martin*, 20 Ohio App.3d at 175, 20 OBR 215, 485 N.E.2d 717. We find that the panel neither lost its way nor created a miscarriage of justice in convicting Hunter of all counts and specifications.

{¶ 130} Based on the foregoing, we reject propositions VIII and IX.

{¶ 131} *Denial of multiple defense motions and objections*. In proposition of law VII, Hunter argues that the three-judge panel erred in denying multiple defense motions and that the cumulative effect of these denials constituted reversible error.

{¶ 132} *State v. DeMarco* (1987), 31 Ohio St.3d 191, 31 OBR 390, 509 N.E.2d 1256, paragraph two of the syllabus, recognized the doctrine of cumulative error. Under this doctrine, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial court error does not individually constitute cause for reversal. Id. at 196-197. See also *State v. Garner* (1995), 74 Ohio St.3d 49, 64, 656 N.E.2d 623. But the doctrine of cumulative error is not applicable to the present case, because there were no multiple errors.

{¶ 133} Hunter's claim that the panel erred in denying various defense motions also lacks merit. First, Hunter argues that the trial court erred in denying a defense request for disclosure of the state's rebuttal witnesses.

{¶ 134} "The criterion for determining whether the state should have provided the name of a witness called for rebuttal is whether the state reasonably should have anticipated that it was likely to call the witness, whether during its case in chief or in rebuttal." *State v. Lorraine* (1993), 66 Ohio St.3d 414, 423, 613 N.E.2d 212.

{¶ 135} Following the defense motion for the names of rebuttal witnesses, the state responded that it was unable to provide this information without knowing what the defense might raise at trial that could necessitate the calling of witnesses

on rebuttal. The panel denied the defense motion because the state did not know who its rebuttal witnesses might be. Based on *Lorraine*, the trial court did not err in denying the defense request. Moreover, the state called no rebuttal witnesses.

{¶ 136} Second, Hunter argues that the panel erred in denying the defense motion to seal the prosecutor's file, because the state might have withheld discoverable evidence that made a difference in counsel's trial preparation. But this court has consistently rejected the argument that the trial court was required to seal the prosecutor's file because the prosecutor *may* have withheld exculpatory evidence. Such a claim is purely speculative. See *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 64; *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 60. Accordingly, the panel did not err in denying this motion.

{¶ 137} Third, Hunter argues that the panel erred in denying the defense motion to prohibit the introduction of victim-impact evidence. Appointed counsel filed a motion in limine to prohibit victim-impact evidence during both phases of the trial. The motion was denied.

{¶ 138} Victim-impact evidence is admissible in certain circumstances. For example, it is admissible when it is related to the facts attendant to the offense. See *State v. Fautenberry* (1995), 72 Ohio St.3d 435, 440, 650 N.E.2d 878. Victim-impact testimony has also been permitted in limited situations in capital cases when the testimony is not overly emotional or directed to the penalty to be imposed. See *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 237.

{¶ 139} Hunter fails to identify any victim-impact evidence that was improperly presented during his trial. Accordingly, we find no error in denying these defense motions.

**{¶ 140}** Fourth, Hunter argues that the panel erred in denying defense motions for a transcript of the grand jury testimony and disclosure of the names of the grand jury witnesses.

**{¶ 141}** "Grand jury proceedings are secret, and an accused is not entitled to inspect grand jury transcripts either before or during trial unless the ends of justice require it and there is a showing by the defense that a particularized need for disclosure exists which outweighs the need for secrecy." *State v. Greer* (1981), 66 Ohio St.2d 139, 20 O.O.3d 157, 420 N.E.2d 982, paragraph two of the syllabus. A particularized need is established "when the circumstances reveal a probability that the failure to provide the grand jury testimony will deny the defendant a fair trial." *State v. Sellards* (1985), 17 Ohio St.3d 169, 173, 17 OBR 410, 478 N.E.2d 781. Determining whether a particularized need exists is a matter within the trial court's discretion. *Greer* at 148.

**{¶ 142}** Hunter claims that he established a particularized need because he was unable to fully confront his accusers without disclosure of their grand jury testimony. But Hunter's claim that the grand jury testimony might have contained material evidence or might have aided his cross-examination does not establish a particularized need. See *State v. Webb* (1994), 70 Ohio St.3d 325, 337, 638 N.E.2d 1023 (rejecting claim that grand jury testimony might have aided cross-examination by revealing contradictions). Thus, the panel did not abuse its discretion in denying the defense motions for grand jury testimony and the disclosure of the names of grand jury witnesses.

**{¶ 143}** Fifth, Hunter argues that several other defense motions were also improperly denied. Initially, Hunter complains that the panel erred in denying the defense motion to argue last during the penalty-phase closing arguments. But the panel committed no error in denying this motion. See *State v. Rogers* (1985), 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph six of the syllabus (state has the right to open and close arguments to the jury during penalty phase).

{¶ 144} Hunter also argues that the panel erred in denying a defense motion to prohibit the state from listing the nature and circumstances of the offense as a matter to be considered in mitigation until first raised by the defense. But no error occurred in denying this motion. See *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 183; *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 101.

{¶ 145} Next, Hunter argues that the panel erred in denying defense motions to dismiss the capital specifications because of constitutional and international-law violations. But, as discussed below in proposition of law V, no error occurred in denying these motions.

{¶ 146} Additionally, Hunter argues that the trial court erred in denying the defense motion to suppress his police statement, because it was obtained in violation of his constitutional rights. However, Hunter was properly advised of his *Miranda* rights and voluntarily waived his rights before talking to police. See *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

{¶ 147} During the suppression hearing, Detective Noel testified that she and Detective Wiggington advised Hunter of his *Miranda* rights before questioning him about what happened to Trustin. A notification-of-rights form was used to advise Hunter of his *Miranda* rights. Noel testified that Hunter read each of his rights aloud and then explained what those rights meant. Hunter then talked to police.

{¶ 148} Detective Noel also testified that Hunter had appeared mentally alert, was not under the influence of drugs or alcohol at the time of the interview, and told investigators that he had completed his GED. Thus, the totality of the circumstances supports the trial court's findings that Hunter was properly advised of his *Miranda* warnings and voluntarily waived them before talking to the police. See *State v. Lather*, 110 Ohio St.3d 270, 2006-Ohio-4477, 853 N.E.2d 279, ¶ 10-13.

{¶ 149} Finally, Hunter argues that the panel erred in denying any and all oral defense motions and objections made at trial. He also challenges all rulings granting the state's motions and objections. Hunter sets forth a list of these objectionable rulings but fails to provide any explanation to support his argument that they were erroneous. Nothing shows that these rulings were improper. Thus, we also reject this argument.

{¶ 150} Based on the foregoing, proposition VII is overruled.

{¶ 151} *Noncapital sentencing*. In proposition of law VI, Hunter argues that the three-judge panel erred in sentencing him to consecutive sentences for his noncapital offenses in violation of his federal and state constitutional rights.

{¶ 152} The panel sentenced Hunter to life without parole for rape in Count Two and eight years for child endangerment in Count Three. The panel stated: "And for the record, the sentence[s] on all counts are to run consecutively to each other, and all sentences imposed are the maximum as provided by law as of the date of the commission of the offense." But by failing to object to the imposition of his consecutive sentences, Hunter forfeited this issue, absent plain error. See *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 377.

{¶ 153} The panel had the authority to impose consecutive sentences on Hunter. See *State v. Elmore*, 122 Ohio St.3d 472, 2009-Ohio-3478, 912 N.E.2d 582, ¶ 35. Moreover, the imposition of consecutive sentences in this case does not implicate Sixth Amendment considerations such as those recently addressed by the United States Supreme Court in *Oregon v. Ice* (2009), 555 U.S. 160, 129 S.Ct. 711, 172 L.Ed. 2d 517.

{¶ 154} Nor does the panel's imposition of consecutive sentences violate Hunter's constitutional right to be safe from cruel and unusual punishment. In *State v. Hairston*, 118 Ohio St.3d 289, 2008-Ohio-2338, 888 N.E.2d 1073, ¶ 1, this court held that the imposition of an aggregate 134-year prison term on a

defendant did not constitute cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution and Section 9, Article I of the Ohio Constitution. *Hairston* stated, "Where none of the individual sentences imposed on an offender are grossly disproportionate to their respective offenses, an aggregate prison term resulting from consecutive imposition of those sentences does not constitute cruel and unusual punishment." Id. at syllabus.

{¶ 155} Although *Hairston* was a noncapital case, the same principle applies to Hunter's noncapital sentencing. None of the individual sentences imposed on Hunter were grossly disproportionate to its respective offenses. Each sentence was within the statutory range for each offense. Accordingly, the aggregate prison term resulting from the consecutive imposition of those sentences was not unconstitutional. Proposition VI is rejected.

{¶ 156} *Constitutionality*. In proposition of law V, Hunter challenges the constitutionality of Ohio's death-penalty statutes. This claim is summarily rejected. See *State v. Carter* (2000), 89 Ohio St.3d 593, 606-608, 734 N.E.2d 345; *State v. Steffen* (1987), 31 Ohio St.3d 111, 125, 31 OBR 273, 509 N.E.2d 383; *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph one of the syllabus.

{¶ 157} Hunter also argues that Ohio's death-penalty statutes violate international law and agreements to which the United States is a party. We have rejected similar arguments. See *State v. Issa* (2001), 93 Ohio St.3d 49, 69, 752 N.E.2d 904.

{¶ 158} *Cumulative error*. In proposition of law X, Hunter makes the generalized claim that the cumulative effect of errors in his trial necessitates reversal of his conviction and death sentence. But Hunter received a fair trial and a fair sentencing determination, and no errors occurred that prejudiced his substantial rights. See *State v. Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, ¶ 177. Proposition X is rejected.

**Independent Sentence Evaluation**

{¶ 159} Having considered Hunter's propositions of law, we must now independently review Hunter's death sentence for appropriateness and proportionality as R.C. 2929.05(A) requires.

{¶ 160} *Aggravating circumstances*. Hunter was charged with and convicted of the capital specifications of R.C. 2929.04(A)(7) and 2929.04(A)(9). The evidence at trial establishes beyond a reasonable doubt that Hunter murdered Trustin Blue while committing or attempting to commit rape, R.C. 2929.04(A)(7). Hunter was also properly convicted of murder of a child under the age of 13, R.C. 2929.04(A)(9).

{¶ 161} *Mitigating evidence*. Against these aggravating circumstances, we are called upon to weigh the mitigating factors contained in R.C. 2929.04(B). Hunter presented seven mitigation witnesses and offered an unsworn statement, which his attorney read into the record.

{¶ 162} Harriet Elizabeth Hunter, the defendant's mother, testified that Hunter was born and raised in Cincinnati. Hunter had a normal childhood and was "just like any other kid." Hunter attended Withrow High School. Hunter was a very supportive son and helped his parents by performing chores and other work around their home. Harriet had a good relationship with Hunter and characterized him as a "loving son and a caring son."

{¶ 163} Harriet was aware that Hunter was involved in drug use, but she did not know the type of drugs he was using. She indicated that Hunter's drug use was not prevalent and did not have an impact upon his conduct. But Harriet knew that Hunter was an alcoholic and drank a lot with her husband.

{¶ 164} Hunter has four biological children. Harriet stated, "He was a good father to his kids." He "worked, took care of them and did things with them." Hunter also had a good relationship with his brothers and sisters and all his nieces and nephews. He spent time with his nieces and nephews by taking

them to shows and going fishing. Hunter's support benefitted the children because "[i]f they needed anything they would come to him."

{¶ 165} Harriet stated that Hunter was devoted to his children and his extended family: "[H]e loved us." She also stated, "[The family] loved him. All of us loved him. The children love him to death." Harriet also testified that she has never seen Hunter lose his temper, become violent, or abuse a child.

{¶ 166} Although Harriet was not around Trustin very often, she discussed Hunter's relationship with Trustin. Harriet testified that "at first Trustin cried when he was around him, but they had a good relationship. They would give each other high fives and stuff like that. * * * He could talk to him and Trustin would talk to him."

{¶ 167} Harriet has talked to Hunter since the charges were brought in this case. She believes that Hunter can be rehabilitated and become a law-abiding and productive citizen. Harriet stated that Hunter is "so sorry that Trustin had died." Finally, Harriet testified that Hunter's execution would have a "[t]errible" impact on her.

{¶ 168} Leevell Hunter, the defendant's father, described Hunter as a "typical little boy" when he was growing up. Leevell stated that Hunter was not a problem as a child and was very dependable. He helped his parents by performing chores, cutting the grass, and doing other things around the house.

{¶ 169} Leevell had suspected that Hunter was using drugs but never confronted him about it. Leevell and Hunter drank alcohol together. Leevell stated, "We used to swap 12 packs, me and him, and booze on the side, Jack Daniels."

{¶ 170} Leevell stated that Trustin had come to their home a few times. He described Hunter's involvement with Trustin: "Whatever he need was [sic] he took care of him. He didn't deny him of it and he would get food of mine that I

had around the kitchen and in the basement * * * and Lamont would give it to him." Leevell has never known Hunter to be violent or threatening.

{¶ 171} Leevell has talked with Hunter about what happened to Trustin since the charges were brought. Leevell said, "I think he [Hunter] is like I am, sorry it happened. Not that he was involved in it, but it happened and he was around when it happened."

{¶ 172} Leevell loves his son and does not want to see him executed. If Hunter were sentenced to death, Leevell stated, "[i]t would hurt me deeply."

{¶ 173} During cross-examination, Leevell acknowledged that Hunter had been convicted twice for selling drugs. Leevell was also aware that Hunter had been convicted of domestic violence against Tamara Mitchell.

{¶ 174} Theresa Tomlin and Hunter had had a romantic relationship between 1987 and 1989. They had one daughter, Ashley Hunter. During their relationship, Hunter was around Tomlin's two-year-old son from a previous relationship. Tomlin stated that Hunter was very good with her son and never abused him. She stated that Hunter "treated [her] kid just like he was his own."

{¶ 175} Tomlin has remained friends with Hunter. She states that he is a very "loving and caring person." Tomlin stated that Hunter has "always been great with [their] daughter. He is always there for her any time she needs anything and also with his ex-wife's kids he is always there for them." He provides them with advice and counsel, takes them to family functions, and takes them out to eat.

{¶ 176} Tomlin describes Hunter as a "great father." Tomlin would not "think twice" about allowing Hunter to be around her own children in an unsupervised fashion, because he is very caring and "would never hurt" a child. Tomlin testified that she has never observed any sign that Hunter might have abused her children.

{¶ 177} Tomlin had an opportunity to observe Hunter with Trustin. Tomlin stated, "Trustin seems [sic] fine when we were around. He didn't seem to be scared or anything."

{¶ 178} Hunter and Ashley continue to have a beneficial relationship. If Hunter received the death sentence, Tomlin stated, "[i]t would kill [Ashley]. It would absolutely kill her." Tomlin added that a death sentence would have the same impact on her.

{¶ 179} Tamara Kay Mitchell and Hunter were married from 1996 to 1999. They had one son, Lamont Jr., and raised two other children together. Mitchell stated that Hunter has had a great relationship with all her children. She said, "I have three children and out of those three children Lamont is the best father that they have. I mean, he's the only father really that they know and I wouldn't trade him for the world." Mitchell stated that Hunter paid the bills and took care of her and her children. Mitchell also testified that Hunter has never been abusive toward her children.

{¶ 180} Mitchell described Hunter as "fun, caring, thoughtful, [and would] help anybody any time, any situation." Mitchell acknowledged that Hunter had a domestic-violence case that involved her. Mitchell stated that had occurred 15 years earlier when they "were young. Things happen. He's not an abusive person though."

{¶ 181} Mitchell observed Hunter and Trustin interact. She stated, "At the times that I observed Trustin with Lamont everything was fine. I used to keep Trustin so Lamont could get him. * * * And when they were picked up Lamont was the one that would pick him up. There was no issue."

{¶ 182} During cross-examination, Mitchell provided further information about the domestic-violence incidents. She stated, "[W]e had three incidents where things happened and they got out of control and, yes, the police were

called. As far as him being violent, no. * * * A push or shove, but nothing where I had to go the hospital to be treated for."

{¶ 183} Debra Barnes, the defendant's oldest sister, testified that Hunter had been a happy child and got along well with everyone in the family. However, there were problems in the family that had an impact on Hunter. Hunter's father was an alcoholic, his parents had arguments, and sometimes there was "hitting."

{¶ 184} Barnes also testified that Hunter had been a construction worker and worked for a company for several years. Hunter was about to start a seal-coating business around the time of Trustin's death.

{¶ 185} She has also observed Hunter interact with his daughter Trinity and said that he is a "great dad." Hunter has also been a great father with his other children and helped them with their homework. Similarly, Hunter has been very good with Barnes's children.

{¶ 186} Barnes has developed a really close relationship with Hunter over the last couple of years. She expressed her love for Hunter and stated that his death would be "totally * * * devastating[.] * * * [Their] family would fall apart."

{¶ 187} Mariah Brown, the defendant's 16-year-old stepdaughter, has known Hunter since she was seven-and-a-half months old. She testified that Hunter has been a good stepfather: "He used to take me to school, do my hair, help me with my school projects, he was there for each play I was in, helped me pick my high schools." Hunter never abused her in any way. Brown testified that if Hunter were sentenced to death, "[i]t would kill" her.

{¶ 188} Ashley Hunter, the defendant's 18-year-old daughter, testified that Hunter has been an important part of her life. She said, "He is everything to me. Like I don't know or I wouldn't know how to act if he wasn't around. I talk to him about going to college and everything and he's my support." Ashley had a loving and nurturing relationship with her father. She stated that if he were

sentenced to death, "[t]hat would kill a part of me." She added, "Like I wouldn't be the same person."

**{¶ 189}** *Hunter's unsworn statement*. Trial counsel read Hunter's unsworn statement to the panel. He wrote:

**{¶ 190}** "Contrary to the charges, I am a loving father to my children, son to my parents, and brothers [sic] to my siblings. I'm a taxpaying citizen of this community.

**{¶ 191}** "I have made mistakes in the past in an attempt to find my way in life. I'm not a saint, but I'm not a monster either. I feel I have paid for my mistakes in the past as for my criminal record. I sold and used drugs back then, but that was then. I have learned from my mistakes and have utilized them as a stepping stone to better myself as a person.

**{¶ 192}** "I have accomplished a few personal goals in my life that I'm proud of. I'm a part owner of my company. I learned a skill and trade in seal coating. I worked for a company called * * * ABC Oak Pavement Services for five years. I took the training and skills I learned from that company and applied them to my own ambition * * * to become partners in a law-abiding, productive business.

**{¶ 193}** "* * *

**{¶ 194}** "Unfortunately, this tragic incident happened in my life and my family life has not been the same. I am truly saddened and remorseful for this tragic incident. Again, I am truly saddened and remorseful for this tragic incident.

**{¶ 195}** "My life will never be the same. Trustin's life is no longer with us physically. I love Trustin and I will always love him. To me he was my son and he will always hold that place in my heart.

**{¶ 196}** "My story did not come to light at trial. I was a great father to my children. I have four biological children: Ashley, 18, Lamont, 14, Alida, 12 and Trinity, 2. I have also raised two other children that are not my biological

children. I was also a father to Trustin, Terrell and Tyree. Their mother, Luzmilda, knew I was there for all three of them and knew that the bond that I formed with them was a natural bond.

{¶ 197} "I am a God-fearing man, and I was fortunate enough to have my parents in my life, so I feel that every child deserves a mother and a father, and that's why I have been there for my children and the children of other men.

{¶ 198} "I would never harm a child. I don't believe in physically punishing kids. I have disciplined my children in the past, but my discipline has never been extreme and/or abusive.

{¶ 199} "I never once laid my hands on Trustin in any harmful way. What happened on January 19th, 2006 was unfortunate.

{¶ 200} "I pray that this letter gives edification and clarity of who Lamont Hunter really is as compared to being Lamont that was depicted and displayed by the media, particularly [the] Cincinnati Enquirer."

### Sentence Evaluation

{¶ 201} We find nothing mitigating in the nature and circumstances of the offense. Hunter raped and murdered his girlfriend's three-year-old son while she was at work. Trustin died from massive head injuries and had been tortured. These facts establish a senseless, horrific crime that lacks any mitigating features.

{¶ 202} The statutory mitigating factors under R.C. 2929.04(B) include (B)(1) (victim inducement); (B)(2) (duress, coercion, or strong provocation); (B)(3) (mental disease or defect); (B)(4) (youth of the offender; Hunter was 37 years old at the time of the offense); (B)(5) (lack of a significant criminal record); (B)(6) (accomplice only); and (B)(7) (any other relevant factors). We find that none of these statutory factors are applicable except (B)(7).

{¶ 203} Under the catchall R.C. 2929.04(B)(7) provision, we give some weight to the evidence of the love and support that Hunter shares with his parents, his brothers and sisters, his ex-wife, Tamara Mitchell, and his former girlfriend,

Theresa Tomlin. In addition, we give weight to evidence that Hunter loves and cares for his children.

{¶ 204} Testimony was also presented indicating that Hunter has a history of drug and alcohol abuse. However, we give little weight to this testimony, because there is no evidence of any connection between Hunter's drug and alcohol abuse and the offenses in this case.

{¶ 205} Hunter also expressed remorse and sorrow for Trustin's death in his unsworn statement. But Hunter also said, "I never once laid my hands on Trustin in any harmful way. What happened on January 19th, 2006 was unfortunate." Thus, Hunter continues to deny any responsibility for Trustin's murder. Hunter's denials negate any mitigating weight that we might otherwise give to his expressions of sorrow. See *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 266; *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 178. The evidence does not suggest any other (B)(7) mitigating factors.

{¶ 206} Based on our independent weighing of the evidence, we find that the aggravating factors of Hunter's murdering Trustin Blue while committing or attempting to commit rape under R.C. 2929.04(A)(7) and of murdering a child who was younger than 13 under R.C. 2929.04(A)(9) clearly outweigh any mitigating factors beyond a reasonable doubt. We also find that the penalty imposed in this case is both appropriate and proportionate when compared to death sentences imposed for other child murders under R.C. 2929.04(A)(9). See *State v. Fitzpatrick*, 102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d 927, ¶ 119 (12-year-old victim); *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 196 (six-year-old victim); and *State v. Smith*, 97 Ohio St.3d 367, 2002-Ohio-6659, 780 N.E.2d 221, ¶ 79 (six-month-old victim).

{¶ 207} We also find that the death penalty is appropriate and proportionate when compared to death sentences approved for other rape-

murders.  See *State v. Mason* (1998), 82 Ohio St.3d 144, 170-171, 694 N.E.2d 932; *State v. McGuire* (1997), 80 Ohio St.3d 390, 391, 404, 686 N.E.2d 1112; and *State v. Phillips* (1995), 74 Ohio St.3d 72, 106, 656 N.E.2d 643.

### Conclusion

**{¶ 208}** We affirm Hunter's convictions and sentence of death.

Judgment affirmed.

O'CONNOR, C.J., and PFEIFER, LUNDBERG STRATTON, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

_____

Joseph T. Deters, Hamilton County Prosecuting Attorney, and Ronald W. Springman Jr., Chief Assistant Prosecuting Attorney, for appellee.

Bruce K. Hust and Herbert E. Freeman, for appellant.

_____