[Cite as *State v. Henson*, 2020-Ohio-4019.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

STATE OF OHIO,

 PLAINTIFF-APPELLEE,      CASE NO. 9-19-75

 v.

CESJAR HENSON,         O P I N I O N

 DEFENDANT-APPELLANT.

Appeal from Marion Municipal Court
Trial Court No. TRC 1903184

Judgment Affirmed

Date of Decision: August 10, 2020

APPEARANCES:

 *Carlos M. Crawford* for Appellant

 *Michael D. Swartz* for Appellee

**SHAW, P.J.**

{¶1} Defendant-appellant, Cesjar Henson ("Henson"), brings this appeal from the October 30, 2019 judgment of the Marion Municipal Court sentencing him to serve 180 days in jail, with 155 suspended, after Henson was convicted by a jury of OVI with a chemical test refusal and a prior OVI within 20 years in violation of R.C. 4511.19(A)(2). On appeal, Henson argues that the trial court erred by failing to suppress the HGN field sobriety test, that the trial court erred by permitting testimony regarding Henson's refusal to take a breath test, and that the OVI conviction was against the manifest weight of the evidence.

*Background*

{¶2} On December 3, 2018, at around 1:00 a.m., a paramedic riding in the front passenger seat of a "MedCare Ambulance" observed a light-colored SUV going "all over the road." After observing numerous incidents, the paramedic feared for the safety of others and called 1-800-GRAB-DUI to report the SUV.

{¶3} The paramedic stayed on the phone with a dispatcher for nearly nineteen minutes. During that time, the MedCare Ambulance followed the SUV and the paramedic reported the driver's activities, noting multiple incidents wherein the driver was "all over the road," which included the driver nearly running into a guard rail. At one point the SUV driver also went into a ditch and then came back out. The paramedic informed the dispatcher of the license plate of the SUV.

{¶4} The paramedic observed the driver pull over and stop and open his door slightly, but the paramedic could not see what the driver was doing. The MedCare Ambulance pulled over ahead of the driver and watched him through a mirror. The paramedic reported that the driver was a white male and that she thought he was drinking something when he pulled over. Shortly after pulling over, the driver of the SUV sped away and the ambulance resumed following up until the point that the SUV was stopped by police.

{¶5} Trooper Brandon Blackwelder of the Ohio State Highway Patrol received the dispatch alleging that there was a reckless driver traveling northbound on U.S. 23 in a light colored SUV. At around 1:08 a.m., Trooper Blackwelder located the vehicle and pulled up behind it on a four-lane road. Almost immediately Trooper Blackwelder observed the driver make a marked lanes violation, so he initiated a traffic stop.

{¶6} Trooper Blackwelder approached the driver, Henson, who had rolled down the rear, driver's-side window of the SUV but not the actual driver's window. Trooper Blackwelder asked Henson to roll down his driver's-side window and Henson indicated that it did not work. While briefly conversing with Henson through the rear window, Trooper Blackwelder smelled the odor of an alcoholic beverage. Trooper Blackwelder also observed that Henson had red eyes and slow, slurred speech.

{¶7} Trooper Blackwelder asked Henson to step out of the vehicle and when Henson got out, Trooper Blackwelder noted that the odor of an alcoholic beverage was emanating specifically from Henson's person. Trooper Blackwelder conducted a pat-down of Henson for weapons and he could smell the odor of alcohol from Henson's breath. Trooper Blackwelder asked Henson how much he had to drink and Henson responded that he had just finished a 14 hour work shift at a bar and grill and had not consumed any alcohol.

{¶8} Trooper Blackwelder ordered Henson to his patrol car where the HGN test was administered to Henson as Henson sat on the backseat of the cruiser facing outward. Six of six clues of impairment were observed. Trooper Blackwelder noted that if four of six clues of impairment were observed, there was an 88 percent chance that the driver was over the legal BAC driving limit of .08.

{¶9} Trooper Blackwelder then administered the walk and turn test, where six clues of impairment were observed, followed by the one leg stand test, where three clues of impairment were observed. Next, Trooper Blackwelder administered additional non-standardized field sobriety tests, asking Henson to recite the "ABCs" from "c" to "x." Henson initially skipped "s" and "t" and paused to restart, waiting over ten seconds. Trooper Blackwelder then asked Henson to count backwards from 76 to 42. Henson ended at 40 instead of 42. The HGN test was not recorded on

Trooper Blackwelder's dash camera but the subsequent tests were recorded as they were done in front of the police cruiser.

{¶10} Henson was offered a breath/chemical test but he refused.

{¶11} Nevertheless, based on his observations, Trooper Blackwelder arrested Henson and charged him with OVI in violation of R.C. 4511.19(A)(2) due to Henson's refusal to submit to a chemical test and due to the fact that Henson had a prior OVI within 20 years. Henson pled not guilty to the charge and filed a jury demand.

{¶12} On July 24, 2019, Henson filed a suppression motion arguing that there was not lawful cause to detain him, that there was not probable cause to arrest him, that the trooper lacked a sufficient basis to request that Henson submit to field sobriety tests, and that the trooper did not administer the field sobriety tests in substantial compliance with R.C. 4511.19(D)(4).

{¶13} The trial court held a suppression hearing on September 12, 2019, wherein Trooper Blackwelder provided testimony. Trooper Blackwelder testified extensively as to how he administered the field sobriety tests. Following the testimony the trial court determined that Trooper Blackwelder had reasonable, articulable suspicion to detain Henson, that Trooper Blackwelder had reasonable, articulable suspicion to administer field sobriety tests, that the field sobriety tests were conducted in substantial compliance with NHTSA standards, and that Trooper

Blackwelder had probable cause to arrest Henson. Henson's suppression motion was denied.

{¶14} Henson proceeded to a jury trial on October 30, 2019, wherein the paramedic and Trooper Blackwelder provided testimony on behalf of the State. The State also introduced into evidence a certified copy of Henson's prior OVI conviction, audio of the paramedic's call to 1-800-GRAB-DUI, and video of the traffic stop. After the State rested its case, Henson testified on his own behalf, contending that he was simply tired from working a long shift, that he was eating a sub while he drove, and that he did poorly on the field sobriety tests because it was cold and windy.

{¶15} The jury returned a guilty verdict against Henson. Henson was sentenced to serve 180 days in jail, with 155 suspended, and he was placed on two years of community control. A judgment entry memorializing Henson's sentence was filed November 1, 2019. It is from this judgment that Henson appeals, asserting the following assignments of error for our review.

**Assignment of Error No. 1**
**The trial court erred when it failed to sustain the appellant's motion to suppress the HGN field sobriety test that was improperly performed while the appellant was sitting in a car.**

**Assignment of Error No. 2**
**The trial court erred when it permitted evidence of testimony and breath test refusal after the appellant requested and was refused the opportunity to speak with counsel.**

**Assignment of Error No. 3**
**The Appellant's conviction was against the manifest weight of the evidence.**

*First Assignment of Error*

{¶16} In his first assignment of error, Henson argues that the trial court erred by failing to sustain his motion to suppress the HGN field sobriety test. Specifically, he contends that the HGN test was not performed in substantial compliance with NHTSA standards because it was conducted while Henson was in a seated position.

Standard of Review

{¶17} "Appellate review of a decision on a motion to suppress presents a mixed question of law and fact." *State v. Burnside,* 100 Ohio St.3d 152, 2003–Ohio–5372, ¶ 8. At a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to evaluate the evidence and the credibility of witnesses. *Id.* citing *State v. Mills*, 62 Ohio St.3d 357, 366 (1992). When reviewing a motion to suppress, "an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Burnside* at ¶ 8 citing *State v. Fanning*, 1 Ohio St.3d 19 (1982). With respect to the trial court's conclusions of law, however, our standard of review is de novo, and we must independently determine whether the facts satisfy the applicable legal standard. *Id.* citing *State v. McNamara*, 124 Ohio App.3d 706 (4th Dist.1997).

Analysis

{¶18} Pursuant to R.C. 4511.19(D)(4)(b), the results of field sobriety tests are admissible when they are administered in substantial compliance with testing standards. *Accord State v. Bozcar*, 113 Ohio St.3d 148, 2007-Ohio-1251, ¶ 28. Moreover, the Supreme Court of Ohio has held that "HGN test results are admissible in Ohio without expert testimony so long as the proper foundation has been shown both as to the administering officer's training and ability to administer the test and as to the actual technique used by the officer in administering the test." *Bozcar* at ¶ 27.

{¶19} At the suppression hearing in this case, Trooper Blackwelder testified that he received training at the academy in standard field sobriety tests, including the HGN test. Trooper Blackwelder testified that he completed the academy in 2018 and that he was trained on the NHTSA manual. He indicated that during training HGN tests were given to individuals with different blood alcohol levels to see what the effects of alcohol looked like in person. He also performed the tests while being observed by other officers and he was eventually certified to administer standard field sobriety tests.

{¶20} As to the HGN test in this case, Trooper Blackwelder testified that once he removed Henson from the SUV, he patted Henson down for weapons and had Henson sit in the backseat of the police cruiser, facing outwards on the

passenger side. At that time, Trooper Blackwelder administered the HGN test to Henson while Henson was in a seated position.

{¶21} Trooper Blackwelder detailed how he performed the HGN test during each step. "The first part of the HGN test is I observed the eyes of the person, making sure he has equal pupil size, doesn't have resting nystagmus, and that his tracking is equal as well."[1] (Sept. 12, 2019, Tr. at 21-22). Trooper Blackwelder checked Henson's pupil size and checked for equal tracking using a stimulus—a pen—holding it approximately 12 inches away from Henson's face going to the left and to the right. "I went to my right for approximately two seconds, I go back across the person's face to observe the other eye, that took approximately four seconds, and then two seconds from that spot back to the nose." (*Id*. at 24). He testified that he extended the stimulus until he did not see the white in Henson's eyes.

{¶22} As to the next part of the test, Trooper Blackwelder testified that he checked for lack of smooth pursuit, and to do that, he did essentially the same thing as before, making two passes approximately 12 inches in front of Henson's face, slightly above eye level. After this portion of the test, wherein Trooper Blackwelder noted Henson's lack of smooth pursuit, he checked for "[d]istinct and sustained nystagmus." (*Id*. at 26). Trooper Blackwelder elaborated, testifying, "[i]t means that the nystagmus I explained earlier, the involuntary jerking of the eye, would be

---

[1] Trooper Blackwelder defined nystagmus as "involuntary jerking of the eye."

present when the stimulus is held out for four seconds at approximately four seconds or longer." (*Id.*) To perform this portion of the test, Trooper Blackwelder explained that he held the pen approximately 12 inches away from the face, slightly above eye level. He then went to his right for two seconds and held the stimulus out until he could not see the white of Henson's eyes for approximately five seconds. While in that position he observed nystagmus. He then checked the other eye and observed nystagmus. He made another pass to check the eyes and detected the same issues at maximum deviation.

{¶23} Trooper Blackwelder then testified as to checking the nystagmus "prior to 45 degrees." (*Id*. at 48). He testified that he would hold the pen approximately 12 inches away from Henson's face and move it approximately shoulder width out on Henson, which was about 45 degrees. Again, he specifically described how he moved the pen and used it as a stimulus and how long he held certain positions for. He repeated the test a second time and found nystagmus prior to 45 degrees in both eyes. Finally, Trooper Blackwelder testified that he performed a "vertical gaze nystagmus" test, and provided testimony as to how that was performed. Altogether, Trooper Blackwelder detected six of six possible clues of impairment in Henson's eyes. Following the completion of the HGN test, Trooper Blackwelder had Henson perform additional field sobriety tests.

**{¶24}** Henson challenged the field sobriety tests at the trial court level, arguing that they were not performed in substantial compliance with NHTSA standards. However, the trial court found that the tests were performed in substantial compliance with the applicable standards. Henson now renews his argument on appeal, focusing solely on the HGN test. He argues that the HGN test was not performed in substantial compliance with NHTSA standards because it was done while Henson was in a seated position rather than in a standing position. He claims that being in a seated position renders the test less scientifically valid by up to 4 percent.[2]

**{¶25}** Similar claims have been made to other Ohio Appellate Courts that an HGN test was not performed in substantial compliance with applicable standards when the HGN test was conducted in a seated position and these claims have been rejected. *State v. Mendoza*, 6th Dist. Wood No. WD-05-094, 2006-Ohio-6462, ¶¶ 34-35; *State v. Dohner*, 11th Dist. Portage No. 2003-P-0059, 2004-Ohio-7242, ¶ 13 ("We, therefore, hold that the results of the HGN test are admissible when the suspect is seated, provided the test is performed in conformity with the officer's training and the standards outlined in the NHTSA manual.").

**{¶26}** Moreover, Trooper Blackwelder explained himself further at trial, stating that he occasionally performed HGN tests from a seated position, with the

---

[2] To support this claim, Henson attached a study to his brief to this Court; however, we cannot consider this as evidence.

driver putting his hands under his chin, for safety. He testified he wanted to be able to control the situation and if he was struck it would be in the abdomen and not the facial area. (October 30, 2019, Tr. at 155). Trooper Blackwelder testified that he was aware other law enforcement agencies sometimes perform HGN tests from a seated position.

{¶27} Trooper Blackwelder noted that he could have performed the HGN test in front of his cruiser, but he elected to perform them from a seated position. He testified extensively to his training and as to how he performed the tests, as well as his familiarity with the NHTSA manual. The trial court found Trooper Blackwelder credible and found that the HGN test was in substantial compliance with the applicable standards. Under the facts and circumstances of this case, we cannot find that the trial court erred by denying Henson's suppression motion. Therefore, his first assignment of error is overruled.

*Second Assignment of Error*

{¶28} In Henson's second assignment of error, he argues that the trial court erred by permitting testimony regarding his refusal to submit to a breath test after Henson had requested to speak with counsel.

{¶29} At the outset, we emphasize that Henson does not cite to any specific portion of the record wherein there was evidence presented that he feels is inadmissible; rather, he just argues that evidence was generally produced. We could

overrule his assignment of error for this reason alone. "[A]n appellate court may disregard an assignment of error pursuant to App.R. 12(A)(2): 'if the party raising it fails to identify in the record the error on which the assignment of error is based or fails to argue the assignment separately in the brief, as required under App.R. 16(A).' " *Rodriguez v. Rodriguez*, 8th Dist. Cuyahoga No. 91412, 2009-Ohio-3456, ¶ 4, quoting App.R. 12(A); *State v. Moore*, 3d Dist. Henry No. 7-19-01, 2019-Ohio-2633, ¶ 10 (" '[i]f an argument exists that can support this assignment of error, it is not this court's duty to root it out.' ").

{¶30} Nevertheless, we will analyze what we deduce to be the portion of testimony that Henson finds objectionable. During Trooper Blackwelder's testimony, the video of the traffic stop and arrest was played for the jury. At one point during the video, Trooper Blackwelder began to read Henson the form regarding Henson's option to take a breath test, and what would happen if Henson refused—a 2255 form. At that time, the following exchange occurred.

> **Q [Prosecutor]. Trooper, I'm gonna do my best to save everyone downtime and get right to the 2255. Can you please just speak up and tell me if you know when it is during this traffic stop? I'm gonna skip ahead a little bit.**
>
> **Do you remember what the Defendant just said there?**
>
> **A. He was explaining to me again that he just got off of work as I was reading the form**
>
> **[Defense Counsel]: Your Honor, may we approach?**

THE COURT:  Okay.  He has an objection.

(This discussion was held out of the hearing of the jury)

[Defense Counsel]:  Yes.  I'm gonna state an objection to the fact that anyone can, at any time, raise the right to talk to an attorney. I don't think, you know, with the jury hearing that, they're gonna infer silence and possibly consider that against Mr. Henson.  So I'd ask that the tape – that we conclude with that, and a curative instruction be indicated to the jury.

THE COURT:  The instruction indicating that they have a right to ask for an attorney.

[Defense Counsel]:  Yes.

THE COURT:  Okay.

[Defense Counsel]:  I mean –

THE COURT:  That doesn't mean everything stops when it comes to this 2255.

[Defense Counsel]:  I know.  But it's out there.  I think a curative instruction is necessary.

THE COURT:  Okay.  Do you have an objection to that [prosecutor]?

[Prosecutor]:  The Defendant's been read his rights twice.  And if there was any constitutional concerns they would have been raised pretrial in a motion to suppress or otherwise.  This hasn't been raised.  All this evidence is admissible –

[Defense Counsel]:  And I understand that he's been mirandized, but to – you know, at this point elicit from the video, talk to my attorney, I mean, quite possible they can infer –

THE COURT:  I don't know if I'm – I'll instruct them he has a right.  Bottom line.  That doesn't mean we stop everything.

**(These proceedings were held in the hearing of the jury)**

**THE COURT:  Ladies and gentleman, you heard the Defendant on the video express his request for an attorney.  Everybody has a right to an attorney in a situation like that.  But in this case, while he's reading the 2255 form to him, doesn't mean everything stops right then and there.  So the attorneys were just concerned you might take that in a wrong sense, but he expressed his right, but the officer doesn't have to stop at that point.**

**Okay [prosecutor] you can proceed.**

(Tr. at 167-169).

{¶31} Assuming that the preceding portion of evidence is what Henson now argues is objectionable, the dialogue establishes that defense counsel raised an objection that was addressed by the trial court via an immediate curative instruction. A jury is presumed to follow the trial court's instruction. *State v. Garner*, 74 Ohio St.3d 49, 59 (1995).

{¶32} Notwithstanding the curative instruction, Henson acknowledges in his brief that under Ohio law there is no constitutional right to counsel prior to taking a breath test. *McNulty v. Curry,* 42 OhioSt.2d 341, 345, 328 N.E.2d 798 (1975). It is well-established that "the right to counsel associated with the protection against self-incrimination contained in the Fifth Amendment to the United States Constitution, or as guaranteed by the Sixth Amendment, does not apply to the stage at which the officer requested the chemical test for alcohol content." *Dobbins v. Ohio Bur. of Motor Vehicles,* 75 Ohio St.3d 533, 537, 1996–Ohio–454, 664 N.E.2d 908 (1996).

{¶33} To circumvent this "well-settled" law, Henson argues that his *statutory* right to counsel as codified in R.C. 2935.20 was violated.[3] However, the Supreme Court of Ohio has specifically stated that the exclusionary rule is not applicable as a sanction for a violation of an accused *statutory* right to counsel. *State v. Griffith*, 74 Ohio St.3d 554 (1996). Thus even if there was a violation here—a violation that Henson does not even bother to specifically identify through citation in his brief—the exclusionary rule would not be the proper remedy.

{¶34} Furthermore, we note that Henson's refusal to submit to a breath test was an element of the actual criminal offense in this matter. In addition, Henson himself testified and acknowledged his refusal to submit to a breath test, rendering any potential error harmless in this instance. (Tr. at 216). For all of these reasons Henson's second assignment of error is overruled.

---

[3] Revised Code 2935.20 reads,

> **After the arrest, detention, or any other taking into custody of a person, with or without a warrant, such person shall be permitted forthwith facilities to communicate with an attorney at law of his choice who is entitled to practice in the courts of this state, or to communicate with any other person of his choice for the purpose of obtaining counsel. Such communication may be made by a reasonable number of telephone calls or in any other reasonable manner. Such person shall have a right to be visited immediately by any attorney at law so obtained who is entitled to practice in the courts of this state, and to consult with him privately. No officer or any other agent of this state shall prevent, attempt to prevent, or advise such person against the communication, visit, or consultation provided for by this section.**
>
> **Whoever violates this section shall be fined not less than twenty-five nor more than one hundred dollars or imprisoned not more than thirty days, or both.**

*Third Assignment of Error*

**{¶35}** In Henson's third assignment of error, he argues that his conviction for OVI was against the manifest weight of the evidence.

Standard of Review

**{¶36}** In reviewing whether a verdict was against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52. In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.*

**{¶37}** Nevertheless, a reviewing court must allow the trier-of-fact appropriate discretion on matters relating to the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

Controlling Statute

**{¶38}** Henson was convicted of OVI in violation of R.C. 4511.19(A)(2), which reads as follows.

> **(2)** **No person who, within twenty years of the conduct described in division (A)(2)(a) of this section, previously has been convicted of or pleaded guilty to a violation of this division, a violation of division (A)(1) or (B) of this section, or any other equivalent offense shall do both of the following:**
>
> **(a)** **Operate any vehicle, streetcar, or trackless trolley within this state while under the influence of alcohol, a drug of abuse, or a combination of them;**
>
> **(b)** **Subsequent to being arrested for operating the vehicle, streetcar, or trackless trolley as described in division (A)(2)(a) of this section, being asked by a law enforcement officer to submit to a chemical test or tests under section 4511.191 of the Revised Code, and being advised by the officer in accordance with section 4511.192 of the Revised Code of the consequences of the person's refusal or submission to the test or tests, refuse to submit to the test or tests.**

Analysis

**{¶39}** Henson contends that his conviction for OVI was against the manifest weight of the evidence because, he claims, the evidence actually supported a finding that he was exhausted after working for 14 hours rather than intoxicated. He argues that there was no direct evidence that he had consumed alcohol. In addition, he contends that the paramedic who called 1-800-GRAB-DUI described Henson as a white male even though he was, as he describes, a dark-skinned Hispanic man.

{¶40} First, the jury in this case was presented with testimony and video of the field sobriety tests and able to judge for itself whether Henson's claim regarding exhaustion was true. The jury found Henson's claim not to be credible, and we will not second-guess the jury on credibility matters. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). Moreover, there is ample evidence to support the jury's determination regarding intoxication given Henson's reckless driving, his slurred speech, glassy eyes and the odor of an alcoholic beverage emanating from his person. His performance on the standard and non-standard field sobriety tests also would support a conclusion that Henson was something other than exhausted. These facts, when combined, create significant circumstantial evidence that Henson had consumed alcohol and was over the legal limit. *State v. Nicely*, 39 Ohio St.3d 147 (1988) (stating circumstantial evidence is not less probative than direct evidence and in some instances is even more reliable).

{¶41} Second, as to Henson's claim regarding the paramedic's misidentification of his skin color, the paramedic explained this issue at trial. The paramedic indicated that she said a "white" male on the phone that night to the dispatcher but she did not actually see the individual; rather, the driver of the MedCare Ambulance indicated his skin color and the caller relayed that to the dispatcher. Further, the paramedic testified that the MedCare Ambulance had followed the SUV for a significant amount of time and observed it all the way up to

the point of it being pulled over.[4] Thus even if the paramedic did misidentify Henson's skin color when he was under a street light in the rain at around 1:00 a.m., she was certain the right vehicle with the right driver was stopped by the police in this case. Based on this evidence, we cannot find that the jury clearly lost its way or created a manifest miscarriage of justice by convicting Henson of OVI.[5] Therefore, his third assignment of error is overruled.

*Conclusion*

{¶42} For the foregoing reasons Henson's assignments of error are overruled and the judgment of the Marion Municipal Court is affirmed.

***Judgment Affirmed***

**WILLAMOWSKI and ZIMMERMAN, J.J., concur.**

**/jlr**

---

[4] She had even relayed Henson's license plate.
[5] Henson does not make any arguments regarding other elements in his OVI such as his refusal to submit to a chemical test or his prior conviction within 20 years. Even if he did, these issues were readily established in the record.