[Cite as *State v. Parsons*, 2025-Ohio-1324.]

## IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

    CASE NO. 9-24-16

v.

JEREMY KEITH PARSONS,

    **O P I N I O N**

    DEFENDANT-APPELLANT.

Appeal from Marion County Common Pleas Court
General Division
Trial Court No. 23-CR-356

**Judgment Affirmed**

**Date of Decision:  April 14, 2025**

**APPEARANCES:**

    *Donald Regensburger* and *Samuel H. Shamansky* for Appellant

    *Allison M. Kesler* for Appellee

**MILLER, J.**

{¶1} Defendant-Appellant, Jeremy Keith Parsons ("Parsons"), appeals from the April 1, 2024 judgment of the Marion County Court of Common Pleas, following a jury trial and sentencing. Parsons argues his conviction for sexual battery was against the manifest weight of the evidence and that the trial court's imposition of a fine at sentencing violated his constitutional rights. For the reasons that follow, we affirm.

## I.    FACTS AND PROCEDURAL HISTORY

{¶2} Parsons was charged with committing two offenses against his stepdaughter, J.B. Count 1 charged sexual battery, in violation of R.C. 2907.03(A)(5), a third-degree felony. Count 2 charged rape, in violation of R.C. 2907.02(A)(2), a first-degree felony. The alleged victim of the offenses was J.B., who was 16 years old at the time of the incident. The case proceeded to a jury trial on February 27 and 28, 2024.

### A.    Trial

{¶3} Four witnesses testified during the trial: J.B., the alleged victim; Stacy Ison ("Nurse Ison"), a sexual assault nurse examiner who met with J.B.; John Endicott ("Deputy Endicott"), a deputy for the Marion County Sheriff's Office; and Kaitlyn Barber ("Detective Barber"), a detective for the Marion County Sheriff's Office.

**{¶4}** J.B. testified she was living with Parsons, her mother, and her two younger sisters on the day of the alleged incident: July 28, 2023. They were preparing to host an upcoming birthday party for one of J.B.'s sisters. Late that night, J.B. was in the kitchen with her mother and Parsons when her mother went upstairs to go to sleep. Parsons was drinking high-alcohol-content beer and offered J.B. some. J.B. testified that Parsons drank around three beers that night and she did not have her own beer—she just took some sips from Parsons' beer and could not remember how much she drank.

**{¶5}** J.B. started feeling very tired, so she laid her head down on the kitchen counter. Parsons then started rubbing her back and shoulders, which she acknowledged he had done a few times before but it made her feel uncomfortable. She told Parsons that she was going to go to bed and tried to walk to her room, but she ran into the doorframe while exiting the kitchen. Parsons came over to her and said he was going to help her into bed, which he did despite J.B. telling him that she did not need any help. After helping J.B. into bed, Parsons asked if she needed anything and she responded by telling him to leave. Parsons laughed, said that was not very nice, did not leave, and closed the doors to her room.

**{¶6}** According to J.B., Parsons then came over to her bed, started rubbing J.B.'s back and shoulders underneath her shirt, and then his hand went down her pants, but not underneath her underwear. J.B. testified that she was scared. Parsons then put his hand down the front of her pants and underneath her underwear before

-3-

putting his fingers inside of her vagina. After he removed his fingers, Parsons grabbed J.B.'s hand and put it at the front of his pants. She moved her hand back, and then Parsons put his hand down the front of her pants again. J.B. sat up, grabbed his wrist, and told him to get out. Parsons paused, she told him once again to get out, she heard him zip up his pants, and then he left.

{¶7} J.B. testified that, after Parsons left her room, she grabbed her pocketknife and "slit" her wrist. (Trial Tr. at 287). She explained that cutting her wrist was something she had done before and, in fact, she had been doing it since the sixth grade. Later, she went for a walk outside to calm down. According to J.B., the next morning Parsons "made a comment like, what even happened last night? And [she] looked at him and said that [she] was drunk, and he took advantage of [her] and then he didn't argue or anything." (*Id.* at 299).

{¶8} J.B. explained that she did not tell anyone about the incident right away because she was scared of hurting her mother and sister and did not think her mother would believe her. She wrote about the incident in her journal four days after it happened, and she told her uncle about it approximately a week after it happened. J.B. acknowledged on cross-examination that her journal did not reference cutting her wrist. She also acknowledged that she was able to go for a walk after the incident despite being so intoxicated prior to the incident that she was unable to walk. J.B. explained that the walk outside "would have been a couple of hours" after the incident. (*Id.* at 303). She also acknowledged on cross-examination that

she had previously had some conflict with Parsons, that one of her sisters hated Parsons, that she knew "that being touched was wrong and [she] had people to whom [she] could report," and that she chose to go back to the home where Parsons resided even after telling her uncle about the incident. (*Id.* at 308). J.B. explained that she went back to the home because she did not want her mother finding out about the incident.

{¶9} Next, Nurse Ison testified that she is a specially-trained nurse who treats patients who report being survivors of sexual assault, domestic violence, or human trafficking. She met with J.B. on August 11, 2023. J.B.'s recitation of the incident to Nurse Ison was generally consistent with her recitation at trial, set forth above. However, J.B. did not mention cutting her wrist, and Nurse Ison testified that she did not see any injuries on J.B.'s body and did not document any injuries. According to Nurse Ison, J.B. declined to have a physical examination because it had been two weeks since the incident by that time; Nurse Ison did not find this to be out of the ordinary. Additionally, J.B. did not tell Nurse Ison that she took a walk outside to calm down after the incident.

{¶10} Deputy Endicott testified that he received a call on August 10, 2023 for a reported sexual assault. He went to Parsons' residence and separately spoke with J.B., her mother, her youth pastor, and Parsons. Parsons gave Deputy Endicott his version of what occurred on the night of the incident, which Deputy Endicott relayed during his testimony. Parsons said that they had been drinking in the

kitchen, specifically three higher-alcohol beers. J.B. was not feeling well and leaned over the kitchen counter. Parsons rubbed her back and told her she needed to go to bed. In her bedroom, Parsons was rubbing her back again, "trying to make sure she wasn't going to get sick." (Trial Tr. at 351). J.B. then slid onto her back, which caused Parsons' hand to go to her stomach, and she then "grabbed his hand and shoved it down her pants" underneath her underwear. (*Id.* at 351-352). "[T]hen he had started to pull his hand out of her pants and, when he started to pull his hand out of her pants, she shoved it back down there farther in her pants and then he was able to then get his hand out of her pants." (*Id.* at 352). The next thing he remembered was going outside and crying on the back porch because he was upset with the whole situation.

{¶11} Detective Barber testified that Parsons gave her a statement at the Sheriff's office after Deputy Endicott had spoken with him. During the trial, Detective Barber provided a summary of Parsons' version of the incident similar to that provided by Deputy Endicott. She testified that Parsons told her J.B. had a few sips from his first beer and that she drank less than half of his third beer. Detective Barber arrested Parsons at the conclusion of their discussion.

## B.    Verdict and Sentencing

{¶12} The jury returned a guilty verdict on the sexual battery count and a not guilty verdict on the rape count. The trial court subsequently held a sentencing hearing. After hearing from J.B. and some family members, the trial court sentenced

Parsons to a term of 60 months in prison. The trial court also imposed a $10,000 fine and explained that Parsons would be subject to a mandatory five-year period of post-release control.

{¶13} As part of the sentencing hearing, one of J.B.'s family members suggested to the court a concern for the safety of Parsons' daughter and other step-daughter. The judge acknowledged during the sentencing hearing that he did not have the authority to restrict Parsons' behavior after Parsons is released from prison; the Adult Parole Authority would have that authority. The judge explained that Parsons' relationship with J.B. facilitated the offense and the reason for imposing the fine was to make it more difficult for Parsons "to have contact with minor children by being able to use money put on his books to call them or write him – or write letters or anything that might lead him to be able to have access to minor children during this period of incarceration." (Mar. 28, 2024 Tr. at 29). The judge expressed hope that imposing the fine would prevent future grooming and victimization. This appeal followed.

## II. ASSIGNMENTS OF ERROR

{¶14} Parsons raises two assignments of error for our review:

### First Assignment of Error

**Appellant's convictions were against the manifest weight of the evidence in violation of his right to due process as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and comparable provisions of the Ohio Constitution.**

**Second Assignment of Error**

**The trial court's imposition of a $10,000.00 fine was, by its own admission, an attempt to impose and enforce an unlawful, cruel and unusual punishment in the form of a no-contact order in violation of Appellant's rights as guaranteed under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and comparable provisions of the Ohio Constitution.**

## III.  DISCUSSION

### A.  First Assignment of Error

{¶15} In the first assignment of error, Parsons argues that his conviction was against the manifest weight of the evidence.

#### 1.  Standard of Review

{¶16} The "manifest-weight-of-the-evidence standard of review applies to the state's burden of persuasion." *State v. Messenger*, 2022-Ohio-4562, ¶ 26. "[W]e review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial." *State v. Wilks*, 2018-Ohio-1562, ¶ 168. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting" evidence. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52 (1997), quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). Yet, "[o]nly in exceptional cases, where the evidence 'weighs heavily

against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 2012-Ohio-5233, ¶ 9 (3d Dist.), quoting *State v. Hunter*, 2011-Ohio-6524, ¶ 119.  To reverse a judgment from a jury trial on the weight of the evidence, all three appellate judges must concur.  Ohio Const., art. IV, § 3(B)(3).

### 2.    Applicable Law

{¶17} Parsons was convicted of sexual battery in violation of R.C. 2907.03(A)(5).  That statute prohibited a person from engaging in "sexual conduct" with another person when the offender is the other person's stepparent.  R.C. 2907.03(A)(5).  As used in the statute, the term "sexual conduct" was defined as including,  "without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another."  R.C. 2907.01(A).

### 3.    Analysis

{¶18} Parsons "readily acknowledges" that the State provided evidence at trial that "would satisfy a sufficiency analysis." (Appellant's Brief at 11).  However, according to Parsons, J.B.'s credibility was called into question and resulted in his conviction being against the manifest weight of the evidence.  Specifically, he highlights: (1) J.B. testified she was so intoxicated on the night in question that she could not walk, but J.B. also testified she went for a walk outside after the alleged incident and told Nurse Ison that she was merely tired and drowsy; (2) J.B. testified she "slit" her wrist after the alleged incident, but Nurse Ison did not locate any such

injury and J.B. did not describe any such injury in her journal; (3) J.B.'s intoxication during the time of the alleged incident generally calls into question her ability to correctly recall the events of the evening in question; and (4) J.B. and her sister had prior conflicts with Parsons, allegedly creating a motive for J.B. to lie about his conduct.

{¶19} Having reviewed the record, we do not find the jury clearly lost its way and created a manifest miscarriage of justice when it found Parsons guilty of sexual battery. First, there was not necessarily any inconsistency in J.B.'s testimony regarding her ability to walk. She explained on cross-examination that a couple of hours passed between the incident and when she took a walk outside. (*See* Trial Tr. at 302-303). Additionally, the reference to being tired and drowsy related to how she felt in the kitchen prior to the incident. We also do not find it necessarily inconsistent that J.B. cut her wrist with a pocket knife after the alleged incident yet Nurse Ison did not locate any such injury and J.B. did not describe such an injury in her journal. There was no evidence concerning the extent of any injury, Nurse Ison saw J.B. two weeks after the incident, and J.B. testified she had previously sliced her wrist and had been doing so since the sixth grade. Although Nurse Ison testified that, if J.B. had cut her wrist she would have seen the resulting injury, Nurse Ison had no knowledge of the extent of the alleged cut and also testified that she did not conduct a physical exam of J.B. (*Id.* at 335-336). Concerning the journal, it is not surprising J.B. might leave that detail out of her own journal, and it is not incredible

for the fact-finder to accept the version of events the alleged victim gave under oath instead of in a journal. *State v. Goller*, 2024-Ohio-5983, ¶ 56 (3d Dist.). More importantly, J.B. was always consistent in claiming how Parsons put his hand down the front of her pants and digitally penetrated her vagina. *E.g., State v. Harris*, 2011-Ohio-4066, ¶ 31 (9th Dist.) (conviction for sexual battery was not against the manifest weight of the evidence where, although "the victim changed some parts of her story, she consistently maintained that [defendant] digitally penetrated her vagina without consent").

{¶20} Regarding J.B.'s intoxication, we note that Parsons had also been drinking alcohol prior to the incident, and all of the testimony indicated J.B. drank considerably less than him. Although we recognize there were two conflicting versions presented at trial regarding who initiated the sexual activity, a conviction is not against the manifest weight of the evidence simply because the fact-finder chose to believe one version of events over another. *State v. Smerglia*, 2023-Ohio-1610, ¶ 18, 25-27 (9th Dist.) (conviction was not against the manifest weight of the evidence despite defendant's argument that he never touched the victim inappropriately, the victim fabricated the allegations for potential financial gain, and the victim's version of events—including that she scooted away from the defendant and crossed her legs while driving—"strain[ed] credulity" and contained inconsistencies); *State v. Peacock*, 2017-Ohio-2592, ¶ 41 (3d Dist.). The jury was free to discount Parsons' version of events—where a 16-year-old girl *twice*

overpowered a much larger man and forced his hand into her undergarments. We do not disagree with the factfinder's resolution of the conflicting evidence. In resolving conflicts in the evidence, the jury did not clearly lose its way and create a manifest miscarriage of justice.

{¶21} Parsons's first assignment of error is overruled.

### B.    Second Assignment of Error

{¶22} In the second assignment of error, Parsons attacks the fine imposed as part of his sentence. In his brief, Parsons "submits that any sentence beyond that provided by statute violates a defendant's right to due process . . . and his right to be free from cruel and unusual punishments . . . ." (Appellant's Brief at 12). However, he also "acknowledges that a fine of $10,000.00 is generally within the permissive scope of sanctions available for a felony of the third degree under Ohio law." (*Id.* at 14, citing R.C. 2929.18(A)(3)(c)). Thus, he concedes the trial court was allowed to impose the fine under the relevant sentencing statute.

{¶23} Delving deeper, Parsons argues that the trial court imposed the fine "to effectuate a no-contact order," which is a community control sanction. (*Id*. at 14). According to Parsons, because the trial court was prohibited from imposing any community control sanction, the fine was imposed for an unlawful purpose and was a clear and obvious error that deprived him of his right to due process and constituted a cruel and unusual punishment.

### 1.    Standard of Review and Applicable Law

**{¶24}** The statute governing appeals based on felony sentencing guidelines, R.C. 2953.08, "defines the parameters and standards—including the standard of review—for felony-sentencing appeals." *State v. Marcum*, 2016-Ohio-1002, ¶ 21. "[A]n appellate court may vacate or modify a felony sentence on appeal only if it determines by clear and convincing evidence that the record does not support the trial court's findings under relevant statues [identified in R.C. 2953.08(G)(2)(A)] or that the sentence is otherwise contrary to law." *Id.* at ¶ 1; *see also* R.C. 2953.08(G).

> 'Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'

*Marcum* at ¶ 22, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

**{¶25}** The phrase "otherwise contrary to law" in R.C. 2953.08(G)(2)(b) means "in violation of statute or legal regulations at a given time." *State v. Bryant*, 2022-Ohio-1878, ¶ 22. Courts are limited to imposing sentences that are authorized by statute, rather than only being limited to sentences that are not prohibited by statute. *State v. Anderson*, 2015-Ohio-2089, ¶ 13. If a trial court imposes a fine beyond the statutory maximum fine, then the sentence is contrary to law. *E.g., State v. Litteral*, 2012-Ohio-5335, ¶ 33 (3d Dist.) (vacating sentence, and

remanding for resentencing, where the trial court imposed a $400 fine but the statute for sentencing misdemeanors of the fourth degree established a maximum fine of $250); *State v. Forte*, 2013-Ohio-4707, ¶ 3 (8th Dist.). Generally, a court imposing a sentence for a third-degree felony may impose a financial sanction in the form of a fine in the amount of not more than ten thousand dollars. R.C. 2929.18(A)(3)(c).

**{¶26}** "[A]s a general rule, when a prison term and community control are possible sentences for a particular felony offense, absent an express exception, the court must impose *either* a prison term *or* a community-control sanction or sanctions." (Emphasis added.) *Anderson* at ¶ 31. In other words, for a felony offense, a term of imprisonment and community-control sanctions are alternatives. *See id.* at ¶ 23, 28, 31-32. "[A] no-contact order is a community-control sanction." *Id.* at ¶ 17, 32 (trial court erred in imposing both a prison term and a no-contact order).

**{¶27}** R.C. 2929.11 sets forth the overriding purposes of felony sentencing, which the sentencing court must be guided by when sentencing an offender. It states, in relevant part:

> (A) A court that sentences an offender for a felony shall be guided by the overriding purposes of felony sentencing. The overriding purposes of felony sentencing are to protect the public from future crime by the offender and others, to punish the offender, and to promote the effective rehabilitation of the offender using the minimum sanctions that the court determines accomplish those purposes without imposing an unnecessary burden on state or local government resources. To achieve those purposes, the sentencing court shall consider the need for incapacitating the offender, deterring the offender and others from

-14-

future crime, rehabilitating the offender, and making restitution to the victim of the offense, the public, or both.

(B) A sentence imposed for a felony shall be reasonably calculated to achieve the three overriding purposes of felony sentencing set forth in division (A) of this section, commensurate with and not demeaning to the seriousness of the offender's conduct and its impact upon the victim, and consistent with sentences imposed for similar crimes committed by similar offenders.

R.C. 2929.11(A), (B). "R.C. 2929.12 addresses factors to be taken into account when imposing a sentence under R.C. 2929.11." *State v. Jones*, 2020-Ohio-6729, ¶ 19. Specifically, R.C. 2929.12(B) through (F) list factors the sentencing court must consider, which include factors relating to the seriousness of the conduct, the likelihood of the offender's recidivism, and the offender's services in the armed forces. Neither statute "requires a trial court to make any specific factual findings on the record." *Id.* at ¶ 20; *see also* R.C. 2929.11 and 2929.12.

### 2. Analysis

{¶28} To make his argument, Parsons contends that since the fine was a no-contact order, it therefore was a community control sanction, and—because the trial court was prohibited from imposing both a prison term and a community control sanction—the fine constituted a cruel and unusual punishment and was unlawful. We do not agree with Parsons' strained interpretation of the fine, and note that he cites no legal authority in support of his contention that the fine was a no-contact order.

**{¶29}** Simply stated, the fine was not a no-contact order. Nothing in the trial court's sentence actually prohibited Parsons from contacting anyone, including by calling or writing a letter. This is true even though the trial court apparently hoped the fine might have the same effect as a no-contact order. Therefore, the fine was not a community control sanction and, consequently, was not unlawful. As Parsons concedes, the trial court was permitted to impose a $10,000 fine, in accordance with the sentencing statute.

**{¶30}** Parsons also argues the fine "was not designed to protect the public from future crime, or to punish [him], or as a rehabilitative effort." (Appellant's Brief at 14). Thus, he argues the fine was not guided by one or more of the overriding purposes of felony sentencing set forth in R.C. 2929.11. Again, we disagree. The trial court specifically indicated it imposed the fine to protect the public by attempting to prevent future grooming and victimization of others. Furthermore, the fine certainly was meant to punish Parsons. Having reviewed the record, we find that the trial court complied with R.C. 2929.11 in imposing the sentence. (*See also* Mar. 28, 2024 Tr. at 24 (trial court expressly noting it had considered the purposes and principles of sentencing under R.C. 2929.11 as well as the seriousness and recidivism factors under R.C. 2929.12(B) through (E)); Apr. 1, 2024 Judgment Entry of Sentencing). Ultimately, we do *not* clearly and

convincingly find that the sentence imposed was contrary to law.[1]  R.C. 2953.08(G)(2).

**{¶31}** Parsons's second assignment of error is overruled.

## IV.  CONCLUSION

**{¶32}** For the foregoing reasons, Parsons' assignments of error are overruled. Having found no error prejudicial to the appellant in the particulars assigned and argued, we affirm the judgment of the Marion County Court of Common Pleas.

*Judgment Affirmed*

**ZIMMERMAN and WILLAMOWSKI, J.J., concur.**

**/jlm**

---

[1] We note that, although Parsons declares that the fine constituted cruel and unusual punishment in violation of the Eighth Amendment to the U.S. Constitution and Article I, Section 9 of the Ohio Constitution, he does not undertake any sort of Eighth Amendment analysis or cite any legal authority in support of this declaration. *See generally State v. Weitbrecht*, 86 Ohio St.3d 368, 370-372, 1999-Ohio-113 (1999) (discussing when the Eighth Amendment prohibition has been applied and a test for determining whether to reverse a felony sentence on proportionality grounds).  Regardless, "[a]s a general rule, a sentence that falls within the terms of a valid statute cannot amount to a cruel and unusual punishment."  *McDougle v. Maxwell*, 1 Ohio St.2d 68, 69 (1964) ("[i]t is generally accepted that punishments which are prohibited by the Eighth Amendment are limited to torture or other barbarous punishments, degrading punishments unknown at common law, and punishments which are so disproportionate to the offense as to shock the moral sense of the community").