[Cite as *State v. Payne*, 2026-Ohio-988.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### SENECA COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

  v.

ANDRE I. PAYNE,

    DEFENDANT-APPELLANT.

CASE NO. 13-25-16

OPINION AND
JUDGMENT ENTRY

Appeal from Seneca County Common Pleas Court
Trial Court No. 24 CR 0282

Judgment Affirmed

Date of Decision: March 23, 2026

APPEARANCES:

    *Brian A. Smith* for Appellant

    *Stephanie J. Kiser* for Appellee

**WALDICK, J.**

{¶1} Defendant-appellant, Andre I. Payne ("Payne"), brings this appeal from the July 15, 2025, judgment of the Seneca County Common Pleas Court sentencing him to a 60-month prison term after he was convicted in a bench trial of Gross Sexual Imposition. On appeal, Payne argues that his conviction was against the manifest weight of the evidence, and that his sentence was clearly and convincingly contrary to law. For the reasons that follow, we affirm the judgment of the trial court.

*Background*

{¶2} On November 7, 2024, Payne was indicted for Gross Sexual Imposition in violation of R.C. 2907.05(B), a third-degree felony. It was alleged that Payne touched the vagina of his fourth-grade niece and attempted to penetrate her vagina with his penis. Payne pled not guilty to the charge.

{¶3} After waving his right to a jury trial, Payne proceeded to a bench trial on June 30, 2025. At trial, the State presented the testimony of the victim, a detective investigating the matter, and an employee of Seneca County Job and Family Services. Payne testified on his own behalf denying the allegation.

{¶4} On July 1, 2025, the trial court announced its verdict, finding Payne guilty. On July 15, 2025, Payne was sentenced to serve a maximum 60-month prison term. A judgment entry memorializing his sentence was filed that same day. It is

from this judgment that Payne appeals, asserting the following assignments of error for our review.

## First Assignment of Error

**Because the jury lost its way and created a manifest miscarriage of justice in convicting Appellant, Appellant's conviction was against the manifest weight of the evidence.**

## Second Assignment of Error

**Because the trial court improperly considered Appellant's demeanor, separately from Appellant's alleged lack of remorse, in sentencing Appellant to the maximum possible sentence of 60 months in prison, the trial court's sentence of Appellant was contrary to law.**

*First Assignment of Error*

{¶5} In his first assignment of error, Payne argues that his conviction for Gross Sexual Imposition was against the manifest weight of the evidence.

Standard of Review

{¶6} In determining whether a conviction is against the manifest weight of the evidence, we must examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder clearly lost its way and created such a manifest miscarriage of justice that the convictions must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). When applying the manifest weight standard, "[o]nly in exceptional cases, where the

evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 2012-Ohio-5233, ¶ 9 (3d Dist.), quoting *State v. Hunter*, 2011-Ohio-6524, ¶ 119.

## Controlling Statute

{¶7} Payne was convicted of Gross Sexual Imposition in violation of R.C. 2907.05(B), which reads as follows:

> No person shall knowingly touch the genitalia of another, when the touching is not through clothing, the other person is less than twelve years of age, whether or not the offender knows the age of that person, and the touching is done with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person.

## Evidence Presented

{¶8} The victim, T.P., was born in May of 2010. When T.P. was in second grade, she moved into the home of her paternal grandmother, Lavina, in Fostoria because T.P.'s father was incarcerated and T.P.'s mother was struggling with a drug addiction. T.P. continued to live with her paternal grandmother for the next several years. Eventually, T.P.'s paternal uncle, Payne, also moved into the same residence.

{¶9} In 2019-2020, T.P. was in fourth grade. While living in her grandmother's residence, T.P. "bonded" with Payne and they became "really close." Payne and T.P. called each other "partners in crime" because they would break the strict rules set by Lavina. For example, Lavina would not allow T.P. to contact her mother. Payne allowed T.P. to use his cell phone to contact her mother. T.P. testified

that she was not often left alone with Payne in the residence for extended periods of time. She testified that typically she was only left alone with Payne when Lavina went to the grocery store or to a friend's house.

{¶10} T.P. testified regarding an incident that occurred in early 2020, around the time pandemic shutdowns began. She testified that one school night she was with Payne in his downstairs bedroom watching "Coneheads" on a computer. T.P. testified that her grandparents were home at the time but they were upstairs. T.P. testified that she was laying on her side to watch the movie and Payne was behind her. She testified that Payne began rubbing her back "and he started going lower and lower, and he started touching my butt and everything around that area, and then – and then it started getting worse from there." (Tr. at 57).

{¶11} T.P. testified that she was wearing her grandmother's nightgown and a pair of shorts. She testified that Payne took her shorts halfway off. T.P. testified that she "felt frozen, scared." (*Id*. at 58). T.P. testified that at one point Payne got up and went to the bathroom and got lotion then came back and was touching her all over her body. T.P. testified that Payne specifically touched her vagina under her clothes. She also testified that Payne attempted to put his penis inside of her vagina but he did not succeed because it was painful for her.

{¶12} T.P. testified that the incident ended when Payne "jumped [up] real fast and told [her] to put [her] shorts on because he said, and [sic] to go upstairs because [her] grandma was going to look at [her] laundry." (Tr. at 59). T.P. indicated

that she was not supposed to be downstairs with Payne. T.P. testified that she felt Payne knew "he was doing something wrong," which was why he stopped abruptly. (*Id.*)

{¶13} T.P. testified that a similar incident occurred on another occasion. She testified that the incidents occurred over a couple of months and stopped when Payne got a girlfriend.

{¶14} T.P. testified that she did not tell anyone about the incident right away because she was scared and did not know what to do. She testified she did not want to tell her grandmother Lavina because Lavina treated her badly and T.P. was scared of Lavina. She did not feel Lavina would protect her.

{¶15} T.P. testified that she eventually told some of her friends at school about the incident and she was overheard by a teacher. The teacher told the school counselor and the counselor spoke with T.P. and Lavina.

{¶16} T.P. testified that after Lavina spoke with the counselor, Lavina took T.P. to the hospital to have a sexual assault examination conducted; however, T.P. testified that once she told her grandmother who the perpetrator was, her grandmother screamed at her and told her not to tell anyone about the incident. T.P. testified that her grandmother said, "do you really want to get my sons in trouble[?] This is all your fault." (Tr. at 64). T.P. never went inside the hospital for an examination that day.

{¶17} T.P. testified that at the time she disclosed the incidents that occurred, Payne had moved out of the residence. She testified she felt safe from sexual assault at the residence because Lavina and her husband had never touched her inappropriately.

{¶18} T.P. testified she told her mother about the incident via text message and her mother reported the incident to the police and to children's services. Some text message-exchanges between T.P. and her mother were introduced into evidence. T.P. testified that at one point Lavina made her write a letter indicating that T.P. had made everything up, but T.P. testified she did not want to write the letter.

{¶19} T.P. testified that she understood the difference between telling the truth and lying and that she had lied in the past about some smaller issues. However, she was adamant that the incidents occurred and that Payne was the perpetrator.

{¶20} On cross-examination, T.P. was asked about prior stories she had given in previous interviews. In one prior interview T.P. testified she was asleep or nearly asleep when the incident occurred. However, she testified that she remembered certain significant details better than others because they were "scary" and "badly significant." (Tr. at 92).

{¶21} A detective with the Fostoria Police Department testified regarding the investigation following T.P.'s disclosures. He testified that he set up interviews with

T.P., with Payne, and with T.P's father.[1] The detective testified that T.P. was not interviewed for two months after her disclosure because Lavina was not cooperating with the investigation and she would not bring T.P. to be interviewed. In fact, Lavina was ultimately charged with, and convicted of, intimidation of a victim for forcing T.P. to write the letter that said T.P. made up the incident. The detective acknowledged that there was no physical evidence of the crime, but stated that was not uncommon in these situations.

{¶22} An employee of the Seneca County Department of Job and Family Services testified at trial, detailing how Lavina was not cooperative with the investigation. The employee testified that eventually she had to get permission from T.P.'s mother to interview T.P. at school. Lavina was "irate" about the interview. The Seneca County Department of Job and Family Services assisted with returning T.P. to her mother's care.

{¶23} Payne testified on his own behalf at trial. He acknowledged that he had several prior felony convictions and that he had spent a significant portion of his life in prison. Payne also acknowledged living in the same household with T.P. during the time frame alleged.

{¶24} Payne testified that Lavina was cruel to T.P. He testified that T.P. was going through a lot at the house and he felt she was making the accusations to get

---

[1] There were separate allegations made against the victim's father.

away from Lavina. Payne denied ever touching T.P. sexually. In fact, he claimed he was actually "gay," though he acknowledged having a girlfriend at one point. He claimed he only had a girlfriend because he wanted to watch her have sex with another male.

Analysis

{¶25} Payne argues on appeal that his conviction was against the manifest weight of the evidence because T.P. was not a credible witness. Payne argues that there were inconsistencies between T.P.'s interviews and her trial testimony.

{¶26} At the outset, we emphasize that it is well-settled that a verdict is not against the weight of the evidence because a factfinder elected to believe the State's witnesses rather than the defendant's version of events. *E.g.*, *State v. Greer*, 2024-Ohio-694, ¶ 27 (3d Dist.). Here, it is particularly important to defer to the trial court's credibility determinations because the trial court was able to see and hear *both* T.P.'s testimony *and* Payne's denials.

{¶27} Payne attempts to establish that the victim was not credible by pointing to what he claims are "inconsistencies" in her testimony. However, many of the alleged inconsistencies can be attributed to the fact that the first interview with T.P. was short, approximately 12 minutes, while the second interview was much longer and more detailed, approximately 47 minutes. At times, T.P. provided more detail

in one interview, such as Payne going to get lotion at one point during the incident, whereas in the other interview T.P. did not mention these things.

{¶28} However, T.P. was consistent with her testimony regarding the actual sexual acts that occurred, and she testified that she remembered them well because they scared her so badly. She also testified that since the incidents she has trouble trusting men.

{¶29} Payne also argues that the testimony did not establish that Payne specifically touched T.P. under her clothes, but this was clarified in the testimony. T.P. testified that Payne touched her vagina under her clothes. Moreover, she actually testified that Payne attempted to penetrate her vagina with his penis.

{¶30} Payne claims that T.P. likely made up the story because she did not want to live with Lavina. Payne indicated that T.P. was treated poorly in Lavina's residence and that T.P.'s life was miserable there. Notably, at the time T.P. disclosed the incidents, Payne was no longer in the home. Regardless, as stated previously, T.P.'s truthfulness was a matter of credibility for the factfinder.

{¶31} As to Payne's argument that there was no physical evidence to corroborate T.P.'s testimony, the detective clearly testified that it was not unusual to have no physical evidence in cases of sexual abuse at home by a family member.

{¶32} In sum, after reviewing all the evidence in the record, including the testimony, T.P.'s prior interviews, the text messages introduced into evidence, and the letter T.P. was forced to write by Lavina, we do not find that this is one of the

exceptional cases where the evidence weighs heavily against the conviction. *State v. Little*, 2016-Ohio-8398, ¶ 27 (3d Dist.). For all of these reasons, Payne's first assignment of error is overruled.

*Second Assignment of Error*

{¶33} In his second assignment of error, Payne argues that the trial court erred by imposing a maximum prison term in this case.

Standard of Review

{¶34} Under R.C. 2953.08(G)(2), an appellate court may reverse a sentence only if it determines by clear and convincing evidence that the record does not support the trial court's findings under relevant statutes or that the sentence is otherwise contrary to law. Clear and convincing evidence is that which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established. *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

Analysis

{¶35} In order to provide proper context for Payne's argument, we must review what transpired at the sentencing hearing.

{¶36} At the beginning of the sentencing hearing, the State recommended that Payne serve a maximum 60-month prison term due to, *inter alia*, Payne's

*extensive* criminal history and the impact the crime had on T.P. The State argued that Payne had served multiple lengthy prison sentences in the past and yet he continued to be a career criminal. Payne made some inaudible comments after the State provided its recommendation, and he was admonished by the trial court that he would have the opportunity to speak later.

{¶37} The victim's older sister spoke at the hearing, detailing how T.P. was "mutilating" herself at 12 years old because of her mental health issues. T.P.'s sister stated that T.P. would sleep in closets or under her mother's bed due to the trauma she had endured.

{¶38} Defense counsel then spoke in mitigation, arguing in favor of a 36-month prison term. Afterward, Payne made a statement to the trial court indicating he *wanted* the trial court to sentence him to the maximum 60-month prison term, but Payne's attorney indicated that Payne was emotional and the attorney stood by the 36-month recommendation.

{¶39} The trial court then proceeded to sentence Payne, detailing how Payne had violated T.P.'s trust and had shown no remorse for his actions. As the court proceeded to the actual pronouncement of Payne's sentence, the following exchange occurred:

> THE COURT: The Court finds the defendant was afforded all rights pursuant to Criminal Rule 32. I should also – the Court will also note just overall, Mr. Payne, just your demeanor throughout this whole sentencing hearing, too. The Court does see that and the Court does note –

Payne: (Inaudible).

THE COURT: We're going to proceed with sentencing, Mr. Payne. Defendant was afforded all rights pursuant to Criminal Rule 32.

(July 15, 2025, Tr. at 16).

{¶40} The trial court then indicated it had considered the record, the requisite sentencing statutes, R.C. 2919.11 and R.C. 2929.12, and the statutes' underlying purposes. The trial court noted that there was a presumption in favor of prison and that Payne's criminal history indicated he was not amenable to a community control sanction. The trial court then imposed a maximum 60-month prison term. Payne again said something inaudible, and the trial court responded, "Mr. Payne, you don't talk." (Tr. at 18).

{¶41} Payne argues on appeal that the transcript establishes that the trial court improperly increased his sentence based on Payne's "demeanor" at the sentencing hearing. Facially, the record does not support this claim. The trial court noted Payne's demeanor but did not indicate Payne's demeanor "elevated" the sentence from something lesser.

{¶42} Payne argues that his case is similar to *State v. Bryant*, 2022-Ohio-1878, wherein the Supreme Court of Ohio determined that a trial court erred by increasing a sentence *after the sentence had already been imposed* based upon a defendant's outburst in the courtroom. *Bryant* is entirely distinguishable from the case *sub judice* because Payne's sentence had not been imposed when the trial court

-13-

noted Payne's demeanor and there is no indication whatsoever that the sentence was increased based on Payne's demeanor. Payne's reliance on *Bryant* is misplaced.

**{¶43}** While a sentence may be contrary to law if a trial court imposes a sentence based on factors or considerations that are extraneous to those that are permitted by R.C. 2929.11 and R.C. 2929.12, *State v. Davis*, 2025-Ohio-421, ¶ 9 (3d Dist.), here there is no indication that the sentence was based on improper factors. At the very least, Payne has not met his burden to establish by clear and convincing evidence that his sentence was contrary to law. Therefore, his second assignment of error is overruled.

*Conclusion*

**{¶44}** Having found no error prejudicial to Payne in the particulars assigned and argued, his assignments of error are overruled and the judgment of the Seneca County Common Pleas Court is affirmed.

*Judgment Affirmed*

**MIILER, and WILLAMOWSKI, J. J., concur.**

# **JUDGMENT ENTRY**

For the reasons stated in the opinion of this Court, the assignments of error are overruled and it is the judgment and order of this Court that the judgment of the trial court is affirmed with costs assessed to Appellant for which judgment is hereby rendered. The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket. See App.R. 30.

_____
Juergen A. Waldick, Judge


_____
Mark C. Miller, Judge


_____
John R. Willamowski, Judge

DATED:
/jlm